UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

CLARENCE ALBERT SAFFOLD, III,

                    Plaintiff,

        v.                                          Case No. 22-cv-1467-pp

RICHARD FULLER, KEITH JOHNSON,
DR. MCLEAN, DR. KUBER, HSU MANAGER VASQUEZ,
ED NEISNER, DR. RIBAULT, NURSE EPPIN,
NURSE BRADY, JASON BENZEL,
JASON WELLS, CAPTAIN WEIGAND,
SERGEANT LINCOLN and SERGEANT GRAU,

                    Defendants.

## ORDER GRANTING PLAINTIFF'S MOTION FOR LEAVE TO PROCEED WITHOUT PREPAYING FILING FEE (DKT. NO. 2) AND SCREENING COMPLAINT UNDER 28 U.S.C. §1915A

Clarence Albert Saffold, III, who is incarcerated at the Drug Abuse Correctional Center and is representing himself, filed a complaint under 42 U.S.C. §1983, alleging that the defendants violated his rights under federal and state law. This decision resolves the plaintiff's motion for leave to proceed without prepaying the filing fee, dkt. no. 2, and screens his complaint, dkt. no. 1.

## I.     Motion for Leave to Proceed without Prepaying the Filing Fee (Dkt. No. 2)

The Prison Litigation Reform Act (PLRA) applies to this case because the plaintiff was incarcerated when he filed his complaint. See 28 U.S.C. §1915(h). The PLRA lets the court allow an incarcerated plaintiff to proceed with without prepaying the civil case filing fee. 28 U.S.C. §1915(a)(2). When funds exist, the

plaintiff must pay an initial partial filing fee. 28 U.S.C. §1915(b)(1). He then must pay the balance of the $350 filing fee over time, through deductions from his prison trust account. Id.

On December 13, 2022, the court ordered the plaintiff to pay an initial partial filing fee of $24.47. Dkt. No. 5. The court received that fee on January 24, 2023. The court will grant the plaintiff's motion for leave to proceed without prepaying the filing fee and will require him to pay the remainder of the filing fee over time in the manner explained at the end of this order.

## II. Screening the Complaint

### A. Federal Screening Standard

Under the PLRA, the court must screen complaints brought by incarcerated persons seeking relief from a governmental entity or officer or employee of a governmental entity. 28 U.S.C. §1915A(a). The court must dismiss a complaint if the incarcerated person raises claims that are legally "frivolous or malicious," that fail to state a claim upon which relief may be granted, or that seek monetary relief from a defendant who is immune from such relief. 28 U.S.C. §1915A(b).

In determining whether the complaint states a claim, the court applies the same standard that it applies when considering whether to dismiss a case under Federal Rule of Civil Procedure 12(b)(6). See Cesal v. Moats, 851 F.3d 714, 720 (7th Cir. 2017) (citing Booker-El v. Superintendent, Ind. State Prison, 668 F.3d 896, 899 (7th Cir. 2012)). To state a claim, a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to

relief." Fed. R. Civ. P. 8(a)(2). The complaint must contain enough facts, "accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows a court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556).

To state a claim for relief under 42 U.S.C. §1983, a plaintiff must allege that someone deprived him of a right secured by the Constitution or the laws of the United States, and that whoever deprived him of this right was acting under the color of state law. D.S. v. E. Porter Cty. Sch. Corp., 799 F.3d 793, 798 (7th Cir. 2015) (citing Buchanan–Moore v. Cty. of Milwaukee, 570 F.3d 824, 827 (7th Cir. 2009)). The court construes liberally complaints filed by plaintiffs who are representing themselves and holds such complaints to a less stringent standard than pleadings drafted by lawyers. Cesal, 851 F.3d at 720 (citing Perez v. Fenoglio, 792 F.3d 768, 776 (7th Cir. 2015)).

B.     The Plaintiff's Allegations

The plaintiff was incarcerated at Dodge Correctional Institution and Racine Correctional Institution during the events alleged in the complaint. Dkt. No. 1 at ¶3. He names as defendants several officials who worked at those prisons. From Dodge, he sues Doctor Richard Fuller; Keith Johnson, Health Services Unit (HSU) Supervisor/Manager and Warden Jason Benzel. Id. at ¶¶4–5, 13. From Racine, the plaintiff sues Doctors Joseph McLean and Prapti

3

Kuber, Nurses Brady and A. Eppin, HSU Supervisor/Manager Kristin A. Vasquez, Captain Weigand, Sergeants Lincoln and Grau, physical therapist Edward Neisner, Warden Jason Wells and doctor/practitioner Justin Ribault. Id. at ¶¶6–12, 14. The plaintiff sues most defendants in their individual and official capacities; he sues defendants Eppin, Lincoln, Grau, Neisner and Ribault (all Racine employees) in only their individual capacities. Id. at ¶¶7, 10–11, 14.

        1.    *Dodge Events and Claims*

The complaint alleges that on September 3, 2019, the plaintiff was transferred from the Milwaukee County Jail to Dodge. Id. at ¶16. He says it is prison policy to forward all medical files with a prisoner, which should contain his medications, injuries and ongoing treatment. Id. at ¶¶17–18. The plaintiff says his medical files noted injuries to his foot and ankle, head and neck and lower back that he sustained at the jail and that the records mandated treatment and restrictive conditions for his safety and pain management. Id. at ¶¶18–19, 21. He says his medical files mandated an ace wrap for his foot and ankle, Tylenol and ibuprofen for pain, physical therapy, a lower-bunk restriction and moderated (light) physical activity. Id. at ¶20.

Once the plaintiff was at Dodge, Dr. Fuller was assigned as his primary provider. Id. at ¶22. He says he spoke with Jane Doe #1 (who is not a defendant) about his medical needs, as an officer had suggested he do. Id. at ¶¶23–25. Jane Doe's position was to screen incoming prisoners and forward their medical information to the HSU. Id. at ¶28. The plaintiff explained his

injuries and the incidents that led to his injuries, and he discussed his medications and treatments for those injuries. Id. at ¶26. Jane Doe told the plaintiff she would forward the information to HSU staff. Id. at ¶27.

The plaintiff was assigned to Housing Unit 19, where correctional officers told him he was assigned to a top bunk. Id. at ¶¶29–30. He explained his injuries and need for a bottom bunk, and the officers contacted the HSU to verify his needs. Id. at ¶¶31–32. After concluding the call, the officers directed the plaintiff to move to a cell with an open bottom bunk, in line with his medical needs as the HSU had confirmed. Id. at ¶33. The plaintiff says he did not change cells until four days later, when he was moved to Unit 24. Id. at ¶34. But when he got to Unit 24, another correctional officer told him he was assigned to an upstairs cell and a top bunk. Id. at ¶35. The plaintiff again explained his injuries and need for a lower bunk and cell assignment. Id. at ¶36. The officer refused to contact the HSU and told the plaintiff to move into his assigned cell or face disciplinary charges for disruption and disobeying her orders. Id. at ¶37. She suggested he write to the HSU about his need for a bottom bunk. Id. at ¶38. The plaintiff says he "pleaded with her" to contact the HSU, but she gave the plaintiff "a 'direct order' to go lock in[to] the cell." Id. at ¶¶39–40. The plaintiff did as she instructed to avoid facing disciplinary charges. Id. at ¶41.

On September 6, 2019, the plaintiff saw Dr. Fuller for an appointment and described his foot, ankle and back injuries. Id. at ¶¶42–43. The plaintiff discussed his pain and the activities that worsened it, such as walking,

standing up, ascending and descending stairs and bending over. Id. at ¶44. The plaintiff told Dr. Fuller he could climb into a top bunk but that doing so "was extremely difficult and painful and impossible to do without experiencing the pain and discomfort." Id. at ¶¶45–46. The plaintiff told Dr. Fuller he also experienced pain that awoke him during the night and occurred when he got up to use the bathroom. Id. at ¶47. The plaintiff requested a lower-bunk and lower-tier restriction, but Dr. Fuller said he would make a decision once he reviewed the plaintiff's medical files. Id. at ¶¶48–49. He told the plaintiff he would prescribe Meloxicam for his pain. Id. at ¶50.

On September 13, 2019, a week after his appointment with Dr. Fuller, the plaintiff wrote an HSU request form to the doctor because he had not yet received any medication for his pain. Id. at ¶51. He says his "pain was unbearable" from basic daily activities, including walking up and down the stairs and climbing up and down his bunk. Id. Dr. Fuller responded to the plaintiff's HSU request and told the plaintiff "he forgot to order Meloxicam and it would be available" nine days later. Id. at ¶52. On September 18, 2019, the plaintiff sent another HSU request to Dr. Fuller complaining about his pain and asking about the status of his lower-bunk and lower-tier restriction. Id. at ¶53. Dr. Fuller responded that the plaintiff had an appointment on September 20, 2019, but the plaintiff did not receive an appointment that day. Id. at ¶54. The plaintiff filed another HSU request on September 24, 2019, asking why he was not seen on September 20, 2019, and again inquiring about his bottom-bunk restriction. Id. He also told Dr. Fuller that the Meloxicam "did nothing for

[his] pain." Id. Dr. Fuller responded that the plaintiff's foot and back issues "[weren't] serious enough to warrant a low bunk restriction" at Dodge, but he could seek the same restriction at a different institution. Id. at ¶55. The plaintiff says Dr. Fuller did not know how long the plaintiff would be at Dodge. Id. at ¶56.

On September 24 and 26, 2019, the plaintiff filed HSU forms requesting to review his medical records "to see what medical files Fuller had reviewed." Id. at ¶57. He also spoke with a John Doe lieutenant (not a defendant), who told the plaintiff to contact HSU Manager Johnson about his medical concerns. Id. at ¶58. On September 27, 2019, the plaintiff contacted Johnson and complained about his pain and injuries becoming worse at Dodge without a bottom-tier and bottom-bunk restriction. Id. at ¶59. He told Johnson his foot was swollen and that he aggravated his injuries every time he climbed the stairs or the ladder to his bunk. Id. Johnson responded but told the plaintiff there was nothing in his file suggesting he previously had a lower-bunk restriction, and he did not meet the criteria after a physical. Id. at ¶60. The plaintiff asserts that Dr. Fuller had seen the swelling in his ankle, treated it with an ace bandage and prescribed him pain medication. Id. at ¶61. He says Dr. Fuller "was aware of the level of back pain [he] experienced," which he says was "10 on a scale of 1–10." Id. On October 2, 2019, the plaintiff filed an institutional complaint against Dr. Fuller and Johnson about his medical treatment, but he did not receive any response. Id. at ¶¶62–63.

On October 10 and 17, 2019, the plaintiff filed HSU requests to Dr. Fuller asking about treatment for his pain and reiterating his request for a lower-bunk restriction. Id. at ¶64. The plaintiff says Dr. Fuller "responded with indifference to that/those medical condition(s) and only addressed other medical conditions [he] ha[s]." Id. at ¶65. The plaintiff then sent Interview/Information Requests to Johnson and Warden Benzel, noting that he had reviewed his medical files. Id. at ¶66. He says Dr. Fuller wrote that the plaintiff was "too young to be given bunk restriction and that [he] could climb from top bunk using [his] 'good' foot." Id. He explained his pain level and told the officials he feared further injury without a bunk restriction. Id. at ¶67. Warden Benzel responded that the institutional complaint office had asked him to resolve the issue with Johnson. Id. at ¶68. The plaintiff says he "made numerous attempts to resolve issues with medical staff before filing" his institutional complaint and contacting the Warden. Id. at ¶69.

The plaintiff was briefly housed away from Dodge for a court appearance, and when he returned he was moved to Housing Unit 12. Id. at ¶70. He says he had to climb four flights of stairs multiple times per day "to go eat and other things." Id. at ¶71(1).[1] The plaintiff sent more request forms to Dr. Fuller, Johnson and Benzel about his concerns and fear or further injury, but "[n]o one addressed this." Id. at ¶72(1), ¶71(2).

---

[1] The plaintiff's complaint contains two paragraphs numbered 71 and 72. Dkt. No. 1 at 8. The court will use (1) to refer to the first set of paragraphs and (2) to refer to the second set.

Early in the morning on October 19, 2019, the plaintiff was attempting to descend from his top bunk for a prisoner count, when he felt a sharp pain in his back. Id. at ¶72(2). The plaintiff says he lost his footing and fell to the floor. Id. He felt "something pop[]" in his lower back and felt "a sharp, burning sensation into [his] pelvic area." Id. He says he could not stand straight or sit in a chair, and walking made it feel "as if it pinched something in [his] back/hip area." Id. The plaintiff told the John Doe officer on duty (not a defendant) that he needed to go to the HSU. Id. at ¶73. The officer called the HSU and relayed to the plaintiff their directions that he needed "to submit a[n] HSU Request Form first." Id. at ¶74.

The plaintiff did not see Dr. Fuller until October 25, 2019—six days later. Id. at ¶76. He explained what had happened, his level of pain and his inability to climb to the top bunk. Id. He said his cellmate had even switched bunks with him—against the rules—because he saw how much pain the plaintiff was in. Id. Dr. Fuller asked the plaintiff what activities he could do without pain, and the plaintiff reiterated that it hurt to do anything. Id. at ¶¶77–78. Dr. Fuller prescribed a muscle relaxer and, after the plaintiff requested a walking aid, a cane to aid the plaintiff when walking. Id. at ¶79. He also told the plaintiff "he would take care of the bottom bunk." Id. at ¶80. But later that day, a passing officer questioned why the plaintiff and his cellmate were in incorrect bunks. Id. at ¶¶81–82. The plaintiff explained what Dr. Fuller had told him about making sure he would have a lower-bunk restriction. Id. at ¶83. The officer did not see a medical restriction in the electronic prisoner database and

ordered the plaintiff to return to the top bunk. Id. at ¶84. The plaintiff says he had to sleep on the floor that night. Id. at ¶85.

The next day, October 26, 2019, two officers (who are not defendants) saw the plaintiff walking with his cane. Id. at ¶86. They told the plaintiff he should not be on the side of the prison with all the stairs and "made a call." Id. The plaintiff says he "instantly" was moved to a different housing unit. Id. But his pain still worsened, so on November 6, 2019, he submitted another HSU request form to Dr. Fuller explaining his concerns and requesting an x-ray or MRI. Id. at ¶¶87–88. Dr. Fuller responded that he already had assessed the plaintiff's pain and found no symptoms that "warranted further imaging studies." Id. at ¶89. He said he would see the plaintiff again only if he were experiencing new symptoms. Id. On November 9, 2019, the plaintiff filed another HSU form to Dr. Fuller again requesting x-rays. Id. at ¶90. He says he learned that the muscle relaxer Dr. Fuller had prescribed (Baclofen) is used to treat spinal cord issues. Id. Dr. Fuller responded and told the plaintiff to "cease from repeatedly requesting imaging studies which [would] not be done while [he was] at [Dodge] unless [he] ha[d] new symptoms." Id. at ¶91. The plaintiff told Dr. Fuller he knew "numerous" other incarcerated persons had received x-rays for lesser medical issues. Id. at ¶92.

On November 18, 2019, the plaintiff filed another HSU request claiming that he "was experiencing extreme pain and tylenol was not helping." Id. at ¶93. Dr. Fuller saw the plaintiff for an appointment but told him he could not prescribe more medication. Id. at ¶94. The plaintiff asked about an x-ray, and

Dr. Fuller "got visibly frustrated and told [the plaintiff] he couldn't order that at" Dodge. Id. at ¶94. He told the plaintiff he would refer him for physical therapy. Id. But on November 26, 2019, the plaintiff was transferred to Racine. Id. at ¶95.

The plaintiff claims that Dr. Fuller was deliberately indifferent to his painful medical issues, in violation of the plaintiff's federal and state rights. Id. at ¶168. He claims Dr. Fuller violated his rights under the Eighth Amendment, was negligent and committed medical malpractice when he failed to provide appropriate care. Id. The plaintiff says Johnson was deliberately indifferent and negligent to his medical issues, and he committed medical malpractice by failing to ensure that the plaintiff received appropriate medical care despite being aware of the risk to his health or safety. Id. at ¶169. The plaintiff claims that Warden Benzel was deliberately indifferent and negligent by failing to intervene and ensure the plaintiff received appropriate medical care, despite being aware of the unsafe conditions in which the plaintiff was forced to live at Dodge. Id. at ¶170. He says Benzel failed to follow Wisconsin Division of Adult Institution (DAI) policies and disregarded his federal and state rights. Id.

2.    *Racine Events and Claims*

On November 26, 2019, the plaintiff arrived at Racine. Id. at ¶96. He filed his first institutional complaint three days later. Id. at ¶97. Nurse Herrington (not a defendant) responded that the plaintiff was scheduled for physical

therapy and had a TENS unit to use for his pain.[2] Id. at ¶98. The plaintiff believed this was based on Dr. Fuller's order for physical therapy, but he did not receive the TENS unit for two weeks. Id. at ¶¶99–100. On December 19, 2019, the plaintiff filed an HSU request complaining about his pain and telling medical staff that the prescriptions he had were not relieving it. Id. at ¶101. The plaintiff missed his scheduled physical therapy appointment because of a court visit, and the HSU did not reschedule his missed appointment. Id. at ¶102.

On March 3, 2020, Sergeant Lincoln told the plaintiff he had to move to a top bunk. Id. at ¶103. The plaintiff argued about moving because he believed Dr. Fuller at Dodge had approved him for a bottom bunk. Id. at ¶104. He told Lincoln his medical conditions mandated a lower bunk, but she told him he still had to move. Id. at ¶105. The plaintiff filed an HSU request to HSU Manager Vasquez and Dr. McLean complaining about his need for a lower bunk and expressing his concern that being assigned a top bunk could lead to further injury. Id. at ¶106. He also sent requests to Ed Neisner, a physical therapist, complaining about his pain and asking him to approve a lower-bunk restriction. Id. at ¶107.

On March 4, 2020, the plaintiff wrote a letter to Vasquez asking her to address his bunk restriction. Id. at ¶108. He explained his medical conditions

_____

[2] TENS stands for transcutaneous electrical nerve stimulation. "A TENS unit consists of a battery-powered device that delivers electrical impulses through electrodes placed on the surface of [the] skin." See Transcutaneous Electrical Nerve Stimulation (TENS), Cleveland Clinic, https://my.clevelandclinic.org/health/treatments/15840-transcutaneous-electrical-nerve-stimulation-tens.

and needs, including the TENS unit, a walking aid and a lower bunk. Id. He told her that he experienced "extreme pain" every day from climbing to or descending from his bunk and asked her to coordinate with staff to provide his needed treatment and restrictions to manage his pain. Id. at ¶¶109–10. Vasquez did not respond to his letter. Id. at ¶111. The plaintiff had an HSU appointment the same day, during which a Jane Doe nurse (not a defendant) told him Dr. McLean would have to approve his request for a bunk restriction. Id. at ¶112. On March 7, 2020, the plaintiff sent an HSU request to Dr. McLean asking to discuss his bunk restriction. Id. at ¶113. Dr. McLean did not respond, so on March 12, 2020, the plaintiff sent another HSU request "complaining about extreme pain from climbing on top bunk." Id. at ¶114. An unknown nurse (not a defendant) responded that he or she would discuss the issue with a provider and physical therapist in two weeks, when those providers returned to the prison. Id. at ¶115. On March 12, 2020, however, the plaintiff received a letter from Nurse Eppin[3] denying his request for a lower bunk. Id. at ¶116. She said she responded to questions from an institutional complaint examiner explaining that she had showed the plaintiff "how to proper[ly] climb on and off the top bunk." Id.

On May 8, 2020, the plaintiff had an appointment with Dr. Kuber, who took his walking cane and repeatedly told him that he was "too young to need a cane." Id. at ¶117. The plaintiff protested that it was painful to walk without

_____

[3] In the caption of the complaint, the plaintiff spells this defendant's name "Eppin." Dkt. No. 1 at 1. In the body, he spells it "Epping." Dkt. No. 1 at ¶116. Elsewhere in the complaint, he spells the name "Eppin." Dkt. no. 1 at ¶174.

the cane, but the doctor merely reiterated he was too young to need a cane and he'd "be ok." Id. at ¶¶118–19. On April 12, May 25, June 2 and June 21, 2020, the plaintiff filed HSU requests complaining to Dr. Kuber that his pain had increased since he arrived at Racine and was denied a lower bunk and physical therapy. Id. at ¶120. On June 17, 2020, the plaintiff was scheduled for physical therapy and saw Neisner, to whom he explained the source of his pain. Id. at ¶¶121–22. Neisner evaluated the plaintiff and told him he had hyperextended ligaments connecting his foot and ankle, and he suffered from sciatica. Id. at ¶123. Neisner explained that the plaintiff's hip and pelvic bones do not "slide" when he raises and lowers his leg, which caused impingement and radiating pain. Id. at ¶124. The plaintiff continued attending physical therapy appointments until Racine instituted policies to deal with COVID-19 that prevented him from attending. Id. at ¶125. The plaintiff contacted Dr. Kuber and asked her in person to reschedule his missed appointments, and she said she would send a referral to Neisner. Id. at ¶126.

On July 7, 2020, the plaintiff was out of the prison for a court appearance but returned the next day. Id. at ¶127. He had to quarantine for two weeks before he returned to his normal housing unit on July 22, 2020. Id. at ¶128. Sergeant Grau told the plaintiff he was assigned a top bunk on the top tier of the unit. Id. at ¶129. The plaintiff explained his injuries and requirement for a bottom bunk and told Grau he had prescriptions for pain medications and physical therapy. Id. at ¶130. He told Grau it was painful for him to climb stairs or to the top bunk and asked Grau to move him or contact the HSU

14

about his bunk assignment. Id. at ¶131. Grau responded that there was nothing he could do, and the plaintiff would have to talk to Lincoln when she returned from her vacation. Id. at ¶132. The plaintiff says that Grau's "tone and demeanor when he gave [the plaintiff] this directive" made him fear he would be disciplined if he continued to argue, so he moved into the cell. Id. at ¶133.

On July 22, 2020, the plaintiff filed an HSU request asking HSU to correct his bunk assignment. Id. at ¶134. On July 28, 2020, he spoke with Captain Weigand about Racine policies regarding bunking restrictions and assignments. Id. at ¶135. He explained his medical condition and treatment and asked Weigand who he could speak with to get approval for a permanent lower bunk. Id. at ¶136. Weigand asked for the plaintiff's name and prisoner number and "then glanced in the computer at something." Id. at ¶137. He explained that "any nurse could approve this," and he agreed to contact the HSU supervisor to address the situation. Id. at ¶¶138–39. But Weigand never got back to the plaintiff or relayed what the HSU supervisor told him. Id. at ¶140.

On August 5, 2020, the plaintiff had an appointment with Dr. Kuber and asked her again about a bunk restriction and rescheduling his June physical therapy appointments. Id. at ¶141. She told the plaintiff she would consult a physical therapist about the appointments and bunk restriction. Id. at ¶142. On August 9, 2020, the plaintiff spoke with Lincoln about moving to another cell and asked if she would move him to a lower bunk. Id. at ¶¶143–44. Lincoln

reviewed the plaintiff's electronic record and told him he "had a lower bunk restriction since 6/17/20." Id. at ¶145. The plaintiff says all Racine staff that he spoke with failed to adhere to that restriction despite his requests and complaints about his pain and injuries. Id. at ¶146.

On November 20, 2020, the plaintiff was placed on temporary lockup status for ten days. Id. at ¶147. When he returned to his housing unit, he was again assigned a top bunk. Id. at ¶147. On December 1, 2020, he filed an HSU request to speak with a provider about his bunk assignment, but HSU staff told him he had to wait for his next scheduled appointment in January 2021. Id. at ¶148. The plaintiff does not say what occurred during that appointment. On February 15, 2021, he filed another HSU request to Neisner and Dr. Kuber requesting to resume physical therapy and complaining about his back pain and an inability to bend down or walk without pain. Id. at ¶149. On February 17, 2021, he was scheduled for physical therapy but again could not attend because of the prison's COVID-19 protocols and restrictions. Id. at ¶150. He told Dr. Kuber, who responded by telling the plaintiff that "therapist policy denied [him] because [he] missed an appointment." Id. at ¶151.

On May 11, 2021, the plaintiff filed an HSU request to Dr. Kuber, Neisner and Vasquez complaining about his pain and not receiving physical therapy. Id. at ¶152. An unspecified HSU staff member responded that a provider had entered a referral for physical therapy. Id. On June 17, 2021, the plaintiff filed another HSU request to Dr. Kuber about his medical issues and asking to speak with her in person. Id. at ¶153. The plaintiff received a

16

response telling him he would have an appointment with the doctor in July 2021, but at that appointment he saw Dr. Ribault and not Dr. Kuber. Id. at ¶¶153–54. The plaintiff told Dr. Ribault about his pain and medical issues, his history of physical therapy and his need for a bunk restriction. Id. at ¶155. The doctor told him Neisner would take care of it. Id.

On August 15, 2021, the plaintiff filed an HSU request asking about his physical therapy. Id. at ¶156. He received a response telling him he was referred for physical therapy and that the HSU would schedule his next appointment. Id. The plaintiff says he later learned that Neisner refused to treat him after receiving the referral. Id. at ¶157. On September 30, 2021, the plaintiff filed an HSU request to Vasquez requesting a different healthcare provider because Dr. Ribault was not appropriately treating his medical needs. Id. at ¶158. He says he had spoken with Dr. Ribault "on several occas[]ions in person and in writing requesting treatment for [his] pain and bunk restriction." Id. at ¶159. The plaintiff says he argued with Dr. Ribault about his treatment and need for a bunk restriction, but Dr. Ribault "focused on other medical issues" unrelated to his pain. Id. at ¶161. Neither Vasquez nor any HSU staff responded to the plaintiff's request. Id. at ¶160.

On December 20, 2021, the plaintiff filed an HSU request to Vasquez complaining about Dr. Ribault not following through with treatment or scheduling him for appointments. Id. at ¶162. The plaintiff filed additional HSU requests to Dr. Ribault and Vasquez on December 27, 2021. Id. at ¶163. Unnamed HSU staff told the plaintiff he had to personally contact Dr. Ribault.

Id. at ¶164. On January 17, 2022, the plaintiff sent an HSU request to Neisner asking why he had not yet been scheduled for physical therapy, but Neisner did not respond. Id. at ¶165. He filed additional HSU requests on February 6 and March 14, 2022, complaining about Dr. Ribault and his inadequate care. Id. at ¶166. He received no response. Id. On April 8, 2022, the plaintiff was transferred to a different institution. Id. at ¶167.

The plaintiff claims that Warden Wells was deliberately indifferent and negligent to his medical needs when he failed to intervene despite knowing the plaintiff was not receiving proper medical care. Id. at ¶171. He says Wells violated his federal and state rights and DAI policies by disregarding his medical needs. Id. He claims Vasquez violated federal and state law and DAI policies and committed medical malpractice when she failed to carry out her duties as HSU Manager and ensure he received proper medical care. Id. at ¶172. He claims Captain Weigand deliberately and/or negligently failed to follow DAI policy and acted unreasonably to address the risk to the plaintiff's safety of which he was aware. Id. at ¶173. The plaintiff claims Nurses Eppin and Brady presented false information to an inmate complaint examiner, which violated his rights under federal and state law and constituted medical malpractice. Id. at ¶174. He claims physical therapist Neisner violated his federal and state rights by not following doctors' orders, failing to provide physical therapy, failing to ensure the plaintiff received "mandate[d] medical restrictions" and failing to respond to the plaintiff's complaints of pain and requests for physical therapy. Id. at ¶175. He accuses Neisner of being

negligent, not following DAI policies and committing medical malpractice by failing to treat the plaintiff after diagnosing him with sciatica and hyperextended ligaments. Id. The plaintiff claims Drs. Mclean, Kuber and Ribault violated his federal and state rights when they failed to address his requests for a lower-bunk restriction and "instead made excuses" for not providing the restriction. Id. at ¶176. He claims the doctors were negligent, violated DAI policies and committed medical malpractice by failing to notify the prison of his medical restriction once Neisner ordered it. Id. Finally, he says Sergeants Lincoln and Grau violated his federal and state rights by ignoring the order for his lower-bunk restriction. Id. at ¶177. He accuses the sergeants of being negligent, failing to follow through on the doctor's order and violating DAI policies. Id.

The plaintiff seeks declaratory relief stating that the defendants were deliberately indifferent, negligent and/or committed medical malpractice by failing to satisfy his right to "adequate medical care, his right to safe and non-hazardous living conditions, and protection from cruel and unusual punishment." Id. at 21, ¶A.1. He seeks further declaratory judgment that Wardens Wells and Benzel failed to take action and address "hazardous and unsafe living conditions" that caused his injury; that Vasquez, Johnson and Drs. Fuller, Kuber, McLean and Ribault were deliberately indifferent and negligent to his "constant requests for adequate medical care;" and that Neisner was deliberately indifferent and/or negligent and committed medical malpractice. Id. at 21–22, ¶A.2–4. He also seeks compensatory, punitive and

nominal damages against all defendants for his physical and emotional injuries. Id. at 22–23, ¶¶B.1–6, C & D.

C.    Analysis

The plaintiff claims that officials at Dodge and Racine Correctional Institutions failed to provide adequate medical care for his medical needs, failed to provide appropriate medical restrictions or failed to abide by his medical restrictions despite being aware of a hazardous environment. The court reviews these allegations under the Eighth Amendment, which "protects prisoners from prison conditions that cause the wanton and unnecessary infliction of pain, including . . . grossly inadequate medical care." Gabb v. Wexford Health Sources, Inc., 945 F.3d 1027, 1033 (7th Cir. 2019) (quoting Pyles v. Fahim, 771 F.3d 403, 408 (7th Cir. 2014)) (internal quotations omitted).

Not "every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment." Estelle v. Gamble, 429 U.S. 97, 105 (1976). To state a valid Eighth Amendment claim, the plaintiff must allege both that he "suffered from an objectively serious medical condition" and that the defendants were "deliberately indifferent to that condition." Petties v. Carter, 836 F.3d 722, 728 (7th Cir. 2016) (en banc) (citing Farmer v. Brennan, 511 U.S. 825, 834 (1994)). To satisfy the objective component, the plaintiff must show that he had a medical condition "that is so obvious that even a lay person would perceive the need for a doctor's attention." Greeno v. Daley, 414 F.3d 645, 653 (7th Cir. 2005). The plaintiff's

allegations of severe and persistent pain constitute a serious medical need to satisfy the objective component. Walker v. Benjamin, 293 F.3d 1030, 1040 (7th Cir. 2002). Neither negligence nor medical malpractice is enough to support an Eighth Amendment claim. See Farmer, 511 U.S. at 835–36; Estelle, 429 U.S. at 106. A prison official shows deliberate indifference when he "realizes that a substantial risk of serious harm to a prisoner exists, but then disregards that risk." Perez, 792 F.3d at 776 (citing Farmer, 511 U.S. at 837).

### 1. *Official Capacity*

The plaintiff seeks to proceed against several defendants in their official capacities. Claims against an employee in his official capacity represent another way to plead a claim against the entity that he represents or for which the official works. Kentucky v. Graham, 473 U.S. 159, 165 (1985) (citing Monell v. New York City Dep't of Soc. Servs., 436 U.S. 658, 690, n.55 (1978)). The claims against the defendants in their official capacities are construed as having been brought against the Wisconsin Department of Corrections (DOC), the agency for which the defendants work. Id. at 165–66. Because claims against the DOC are "no different from a suit against the State itself," these claims are construed as having been brought against the State of Wisconsin. See Will v. Mich. Dep't of State Police, 491 U.S. 58, 71 (1989) (citing Graham, 473 U.S. at 165–66; Monell, 436 U.S. at 690 n.55). But "neither a State nor its officials acting in their official capacities are 'persons' under § 1983." Id. That means the plaintiff may not proceed against the defendants in their official capacities to recover damages. See Lapides v. Bd. of Regents of the Univ. Sys.

of Ga., 535 U.S. 613, 617 (2002) (citing Will, 491 U.S. at 66); Williams v. Wisconsin, 336 F.3d 576, 580 (7th Cir. 2003).

The plaintiff also seeks declaratory judgment stating that the defendants violated his rights in the past. Unlike monetary damages, the plaintiff may proceed against state officials sued in their official capacities for declaratory relief, see Will, 491 U.S. at 71 n.10 (citing Graham, 473 U.S. at 167 n.14 (1985), and Ex Parte Young, 209 U.S. 123, 159–60 (1908)), but only if the relief he seeks is *prospective*—that is, if he seeks relief from *future* harm. Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc., 506 U.S. 139, 146 (1993). The plaintiff may not use §1983 to obtain a judgment against the defendants in their official capacities "declaring that they violated federal law in the past." Id.

Because the plaintiff seeks only damages and judgment declaring that the defendants' *past* actions violated his rights, he may not proceed against the defendants in their official capacities. The court will dismiss the official capacity claims.

     2.    *Dodge Defendants and Claims*

     a.    Timeliness

As an initial matter, the court notes that some or all the plaintiff's claims against the Dodge defendants may be untimely. The relevant statute of limitations for cases brought under §1983 is "the statute of limitations for personal injuries supplied by the state in which the claim arose." Huber v. Anderson, 909 F.3d 201, 207 (7th Cir. 2018) (citing Wallace v. Kato, 549 U.S. 384, 387 (2007)). The limitation period for §1983 cases arising in Wisconsin is

the three-year limitation provision in Wis. Stat. §893.54 (2018). That three-year limitation period applies to causes of action accruing on or after April 5, 2018. See Huber, 909 F.3d at 207 (citing 2017 Wis. Act 235 (eff. Apr. 5, 2018)) (reducing applicable statute of limitations from six to three years).

The plaintiff claims that he received inadequate medical care at Dodge from September 3 to November 26, 2019. He signed his complaint on November 28, 2022—just over three years after he was transferred from Dodge to Racine. But the plaintiff also says that he exhausted all available administrative remedies for the claims in his complaint. Dkt. No. 1 at ¶178. The three-year limitation period "is tolled while a prisoner completes the administrative grievance process." Walker v. Sheahan, 526 F.3d 973, 978 (7th Cir. 2008) (citing Johnson v. Rivera, 272 F.3d 519, 522 (7th Cir. 2001)). It is not clear whether the plaintiff's claims against Dodge officials are untimely or whether the limitation period for those claims was tolled at some point while he exhausted his administrative remedies, rendering them timely.

Although the plaintiff may believe that his treatment is part of one continuing, on-going violation, that is incorrect. "[F]ailure to treat a significant painful medical condition, with deliberate indifference to the prisoner's situation, is a form of inaction that offends the Constitution. The period of limitations runs from each independently unlawful act or failure to act." Turley v. Rednour, 729 F.3d 645, 654 (7th Cir. 2013) (Easterbrook, J., concurring)) (internal citation omitted). The plaintiff alleges distinct, specific instances of inadequate medical treatment by different medical professionals working at

different institutions. He alleges harm from the Dodge officials only during three months in 2019; he alleges harm from the Racine officials over the course of several *years*, beginning in 2019 and continuing until his transfer in 2022. The wrongs the Dodge officials allegedly committed did not continue through 2022 simply because other officials at Racine similarly failed to treat his pain. The latest the Dodge defendants could have violated the plaintiff's rights, and thus the time the limitations period began, is no later than November 26, 2019, when the plaintiff was transferred to Racine.

But failure to exhaust is an affirmative defense, Jones v. Bock, 549 U.S. 199, 216 (2007), and it is not clear from the complaint that the plaintiff's claims are untimely. The court will not dismiss the claims against the Dodge employees as untimely and will analyze those claims. The defendants are free to pursue a motion to dismiss on the ground that the Dodge claims are untimely, if they feel such a motion is warranted.

b.    Merits

The plaintiff alleges that he arrived at Dodge with his complete medical records, which detailed his various injuries, medications and treatments and his need for a lower bunk. Dr. Fuller initially prescribed the plaintiff Meloxicam for his pain but forgot to order the medication for over two weeks after the plaintiff's initial appointment. He then declined to provide the plaintiff a lower-bunk restriction because, in his view, the plaintiff's medical issues were not serious enough to warrant it. The plaintiff says Dr. Fuller saw the plaintiff's swollen ankle and provided him some treatment (an ace bandage and

medication), but maintained that the plaintiff was "too young" for a bunk restriction and could climb to the top bunk "using [his] 'good' foot." Dkt. No. 1 at ¶66. The plaintiff later fell from his bunk while climbing down, which worsened his injuries and pain. Dr. Fuller provided the plaintiff a muscle relaxer and a cane and suggested he would add a bottom-bunk restriction, but that restriction never appeared in the plaintiff's medical notes. Dr. Fuller refused the plaintiff's numerous requests for imaging studies after his fall and refused to change or add to the plaintiff's pain medications.

Some of the plaintiff's concerns with Dr. Fuller's treatment constitute disagreement or dissatisfaction with his course of treatment, which is not a basis for a constitutional claim. See Estelle, 429 U.S. at 107; Johnson v. Dominguez, 5 F.4th 818, 826 (7th Cir. 2021). Dr. Fuller's forgetfulness, his conclusion that the plaintiff's condition did not warrant a bunk restriction and his declining to provide imaging studies not available at Dodge do not constitute constitutional violations. But the plaintiff also alleges that Dr. Fuller declined to alter the plaintiff's medications despite the plaintiff telling him they were not helping and that his injuries worsened after his fall. A prison official who insists on following an ineffective course of treatment may be liable for his actions. See Greeno, 414 F.3d at 655. The court will allow the plaintiff to proceed on an Eighth Amendment claim against Dr. Fuller.

Although some of his decisions did not constitute deliberate indifference, Dr. Fuller's decisions may have constituted negligence or medical malpractice. Federal courts may exercise supplemental jurisdiction over a state law claim

that is "so related to claims in the action within [the court's] original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. §1367(a). Because the facts that underlie the plaintiff's claim of medical malpractice and negligence are the same as those that underlie his Eighth Amendment claim, the court will exercise supplemental jurisdiction over the plaintiff's state law claims against Dr. Fuller.

The complaint does not state a claim against HSU Manager Johnson or Warden Benzel. The plaintiff alleges that he discussed his medical issues and treatment with Johnson, who told him that nothing in his medical file suggested he previously had a lower-bunk restriction or qualified him for one at Dodge. Johnson spoke with Warden Benzel about the plaintiff's concerns in response to an institutional complaint the plaintiff filed about Dr. Fuller and Johnson, but the plaintiff says the issues remained. Neither Johnson nor Benzel personally treated the plaintiff, and the complaint does not indicate whether Johnson is a medical professional or an administrator. Nonmedical administrators are "entitled to defer to the judgment of jail health professionals so long as" they don't ignore the prisoner or his concerns. Berry v. Peterman, 604 F.3d 435, 440 (7th Cir. 2010). Chief administrators similarly "are ordinarily not personally liable for decisions made by subordinates, even if they receive a letter complaining about those decisions and do not intervene." Courtney v. Devore, 595 F. App'x 618, 620 (7th Cir. 2014) (citing Burks v. Raemisch, 555 F.3d 592, 595–96 (7th Cir. 2009)).

The complaint alleges that the plaintiff made clear to Johnson and Benzel that he was dissatisfied with the treatment he received from Dr. Fuller and remained in pain. Johnson and Benzel did not ignore the plaintiff; they discussed his concerns and reviewed his medical file. They confirmed Dr. Fuller's assessment that the plaintiff did not meet the criteria for a lower bunk. The plaintiff may have been dissatisfied with that outcome and maintained that his treatment was inadequate, but Johnson and Benzel were not deliberately indifferent by deferring to Dr. Fuller's assessment and treatment plan. The court will dismiss defendants Johnson and Benzel.

### 3. *Racine Defendants and Claims*

The plaintiff sues three doctors he saw at Racine. The plaintiff says that Dr. Kuber took the cane Dr. Fuller had provided him and told him he was "too young" to need it. The plaintiff protested that decision and repeatedly requested additional or different treatment for his pain, including a lower-bunk restriction. Dr. Kuber appears to have passed off the plaintiff to Neisner, the physical therapist. When the plaintiff told Dr. Kuber physical therapy was not addressing his needs, especially when those appointments were not rescheduled, Dr. Kuber did not seek an alternative treatment. These allegations suggest that Dr. Kuber was aware of the plaintiff's ongoing conditions but made little effort to solve them, instead passing the buck to another medical provider. The plaintiff has satisfied his burden to allege that Dr. Kuber knew of but was deliberately indifferent to his serious medical needs. The court will allow the plaintiff to proceed on his federal claims against Dr. Kuber and will

exercise supplemental jurisdiction over his related state law claims of negligence and medical malpractice.

The plaintiff first saw Dr. Ribault in July 2021 at an appointment where the plaintiff expected to see Dr. Kuber. Like Dr. Kuber, Dr. Ribault told the plaintiff that Neisner would address his needs and his request for a lower bunk. The plaintiff spoke with Dr. Ribault several times thereafter and filed HSU requests about what he believed was inadequate treatment because Dr. Ribault focused on medical issues unrelated to his pain. The plaintiff says he filed numerous requests and complaints to and about Dr. Ribault in late 2021 and into 2022 before he was transferred to a different institution. The plaintiff sufficiently has alleged that Dr. Ribault was aware of the plaintiff's ongoing medical issues and resulting pain but repeatedly failed to provide him adequate treatment. The court will allow the plaintiff to proceed on his federal and related state claims against Dr. Ribault.

The complaint alleges that the plaintiff filed HSU requests to Dr. McLean as early as March 2020, but that Dr. McLean did not respond. The complaint does not allege that Dr. McLean ever saw the plaintiff, provided him treatment or made any decisions regarding the plaintiff's treatment. Nor does the complaint allege that Dr. McLean knew the plaintiff needed different treatment and was able to provide it but failed to do so. It is not clear whether Dr. McLean was ever aware of the plaintiff's complaints, pain or medical needs. To state a claim against a defendant under §1983, the plaintiff must allege that that defendant "personally participated in or caused the unconstitutional

actions." Alejo v. Heller, 328 F.3d 930, 936 (7th Cir. 2003) (citing Duncan v. Duckworth, 644 F.2d 653, 655 (7th Cir. 1981)). The complaint's few allegations against Dr. McLean do not satisfy that standard and are insufficient to state a claim that he was deliberately indifferent to the plaintiff's serious medical need. Because the complaint does not state a federal claim against Dr. McLean, the court will not exercise its supplemental jurisdiction over any potential state law claims against him and will dismiss Dr. McLean.

The plaintiff also seeks to proceed against Nurses Brady and Eppin. But his allegations against these nurses are minimal. The plaintiff alleges that Nurse Eppin sent him a letter in March 2020 denying his request for a lower bunk. That letter explained that the nurse had responded to questions from an institutional complaint examiner and showed the plaintiff how to properly climb up to and down from the top bunk. The complaint does not allege whether either nurse ever saw the plaintiff, personally treated him or was aware of his medical conditions and pain. It is possible one of these nurses responded to some or several of the plaintiff's HSU requests, but the complaint does not say so. The plaintiff asserts, without elaboration, that Brady and Eppin presented false information to the complaint examiner, which led to the letter Eppin sent to him. He does not say what that false information was or explain how it harmed him. Misleading an inmate complaint examiner is unprofessional, but it does not violate the plaintiff's constitutional rights. See Reimann v. Frank, 397 F. Supp. 2d 1059, 1076 (W.D. Wis. 2005) (rejecting claim that HSU manager lied to inmate complaint examiner because a state

prisoner "does not have a constitutional right to a positive response to his inmate complaint"). The complaint does not allege sufficient facts to state a claim under federal or state law against Nurses Brady and Eppin. Even if the plaintiff's allegations were more detailed, he would not state a claim against either nurse. The court will dismiss those defendants.

The plaintiff alleges that he repeatedly wrote letters, requests and complaints to HSU Manager Vasquez about his need for a lower bunk restriction. He says Vasquez never responded to his attempts to contact her. The plaintiff does not allege that he ever saw or spoke with Vasquez, and it is not clear whether she ever received his requests and letters or knew about his complaints. Nor does the complaint say whether Vasquez ever personally treated the plaintiff or whether she even is a medical professional who could have treated his medical issues. As the court explained above, administrative heads are not obligated to respond to or even address letters prisoners send them about their subordinates. Courtney, 595 F. App'x at 620. The complaint fails to allege that Vasquez had any personal involvement in the plaintiff's treatment and does not connect her to any unlawful acts of her subordinates. The court will dismiss Vasquez.

The plaintiff alleges even less against Captain Weigand. He says that in July 2020, he spoke with Weigand about Racine's policies on bunk restrictions and asked who he could speak with about getting one. Weigand told the plaintiff a nurse could approve his request and agreed to speak with Vasquez about it. The plaintiff alleges that Weigand never got back to him about the

bunk restriction. The plaintiff claims that Weigand failed to follow prison policy and to address the risk to the plaintiff's safety of which Weigand was aware. But the complaint's allegations do not support that conclusion. The complaint does not suggest Weigand is a medical professional, and it does not allege he personally treated the plaintiff or could have. It does not allege that Weigand declined to contact Vasquez about the plaintiff's request or that he even failed to contact her. Nor does it allege that he disregarded the plaintiff's request for a lower bunk. It alleges only that Weigand did not get back to the plaintiff about the request after speaking with him. It is just as possible that Weigand merely forgot about the plaintiff's request while he was performing his other daily responsibilities in the prison, particularly in July 2020 at the height of the COVID-19 pandemic. It is also possible that Weigand *did* report this situation to Vasquez and deferred to whatever her response might have been. Without more, the court cannot conclude that the plaintiff has alleged that Weigand was deliberately indifferent to the plaintiff's medical need.

Nor does the plaintiff allege enough to proceed on a state law claim of negligence against Weigand. Wisconsin law uses "a four-element analysis to determine whether an actionable claim for negligence has been stated." Hoida, Inc. v. M&I Midstate Bank, 717 N.W.2d 17, 26–27 (Wis. 2006). Those elements are "(1) the existence of a duty of care on the part of the defendant, (2) a breach of that duty of care, (3) a causal connection between the defendant's breach of the duty of care and the plaintiff's injury, and (4) actual loss or damage resulting from the [breach]." Id. at 27 (quotation omitted). Weigand owed a duty

of care to the plaintiff as a captain in the prison, and it is possible he breached that duty by not reporting his request to Vasquez or getting back to the plaintiff about it. But his action or failure to act did not cause or contribute to the plaintiff's injury. Again, Weigand is not a medical professional and had no ability or duty to treat the plaintiff's injury. The plaintiff says he repeatedly contacted Vasquez and at least three doctors on his own about his injuries before speaking with Weigand. Whether Weigand reiterated the plaintiff's concerns did not affect the treatment the plaintiff received; that fault lies with the doctors who examined and treated (or failed to treat) the plaintiff. The court has allowed the plaintiff to proceed against those doctors for their alleged failures. The court will not allow the plaintiff to proceed against Weigand, who had no role in the plaintiff's medical treatment.

The complaint alleges that Sergeant Lincoln told the plaintiff he had a top-bunk assignment in March 2020. The plaintiff then spoke with Sergeant Grau in July 2020 and explained his injuries and need for medical treatment. Grau told the plaintiff he could not do anything and that the plaintiff would have to discuss the issue with Lincoln when she returned from vacation. The plaintiff alleges that Grau's "tone and demeanor" suggested that the plaintiff could be disciplined if he argued further. But he does not allege that Grau ever disciplined him or threatened him with discipline. In August 2020, the plaintiff asked Lincoln to move him to a different cell and a bottom bunk. Lincoln then informed the plaintiff he had had a lower bunk restriction since June 2020.

The plaintiff faults Lincoln and Grau for "ignor[ing] doctors order" and not moving him to a lower bunk. Dkt. No. 1 at ¶177. But the complaint fails to support that claim. The plaintiff does not allege that the plaintiff spoke with Lincoln between June and August 2020, when she told him—for the first time—that he in fact had a lower bunk restriction. He did not speak with Grau until July 2020, and Grau told him he did not have the authority to address the plaintiff's request. The complaint does not allege that either sergeant was aware of and refused to follow the bunk restriction, denied the plaintiff a bottom bunk or otherwise "ignored" the doctor's order. Nor did Grau's use of a certain "tone and demeanor" violate the plaintiff's rights. The Constitution does not prohibit verbal harassment or derogatory language, much less use of a tone that one might interpret as threatening, even though those acts may be unprofessional. See Lisle v. Welborn, 933 F.3d 705, 719 (7th Cir. 2019) (citing Beal v. Foster, 803 F.3d 356, 357–58 (7th Cir. 2015). The plaintiff's inference of a threat in Grau's tone is not enough to state a claim against him. The complaint does not support any claim against Lincoln or Grau under federal or state law. The court will dismiss Grau and Lincoln.

The plaintiff alleges that he sent HSU requests to Neisner as early as March 2020 and saw him for physical therapy in June 2020. Neisner diagnosed the plaintiff with hyperextended ligaments and sciatica and explained how he would treat the plaintiff's pain. The plaintiff had to discontinue physical therapy soon thereafter because of COVID-19 protocols. In February and May 2021, the plaintiff sent HSU requests to Neisner asking to

resume physical therapy. Other HSU staff referred the plaintiff to Neisner for treatment around the same time, but the plaintiff learned in August 2021 that Neisner refused to treat him again despite the referral. The plaintiff again requested physical therapy in January 2022, but Neisner did not respond to his request. The complaint does not allege whether the plaintiff saw Neisner again after his appointments were discontinued because of the COVID-19 protocols. Neisner cannot be held liable for not seeing the plaintiff because of COVID-19 protocols or the pandemic in general. But he may be liable for refusing to see the plaintiff in 2021 and 2022. The complaint does not say whether other physical therapists work at Racine or whether Neisner was the plaintiff's only option. But the plaintiff says Neisner diagnosed his conditions and appeared to have a plan of action before he refused to treat the plaintiff despite doctors' referrals. These allegations sufficiently state a claim against Neisner for intentionally and deliberately disregarding the plaintiff's need for medical care. The court will allow the plaintiff to proceed on his federal and state claims against Neisner.

The plaintiff does not state a claim against Warden Wells. The body of his complaint does not allege that Wells was personally aware of the plaintiff's medical needs and failed to intervene. He claims only that Wells, presumably because he is the warden, should have ensured the plaintiff received proper care but failed to. But under §1983, "[g]overnment officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*." Iqbal, 556 U.S. at 676. The plaintiff must explain what

the supervisor himself personally did or failed to do that violated his rights. Id.;
Day v. Subsecretario del Sistema Penitenciario Federal, 838 F. App'x 192, 193
(7th Cir. 2021). The complaint does not satisfy this standard and does not
suggest Wells was ever aware that the plaintiff had medical issues for which he
believed he was receiving inadequate treatment. The plaintiff's allegations are
insufficient for the court to conclude that Wells knew of but was deliberately
indifferent to the plaintiff's medical needs. The court will dismiss Wells.

Finally, the plaintiff seeks a judgment declaring that the defendants' acts
while he was incarcerated at Dodge and Racine violated his federal and state
rights. But the plaintiff no longer is incarcerated at those facilities, and he does
not allege that he expects to return there. Because the plaintiff has been
transferred, "a declaratory judgment would not affect [the defendants'] behavior
towards [the plaintiff]." Pearson v. Welborn, 471 F.3d 732, 743 (7th Cir. 2006)
(citing City of Los Angeles v. Lyons, 461 U.S. 95, 103–04 (1983); and Davis v.
District of Columbia, 158 F.3d 1342, 1348 (D.C. Cir. 1998)). That means the
plaintiff's request for declaratory relief is moot. See Bigbee v. Nalley, 482 F.
Supp. 2d 1092, 1099 (W.D. Wis. 2007) (citing Robinson v. City of Chi., 868
F.2d 959, 966 n.5 (7th Cir. 1989); and Higgason v. Farley, 83 F.3d 807, 811
(7th Cir. 1996)). Even if his request were not moot, declaratory relief under
§1983 "is only proper if there is a continuing violation of federal law." Kress v.
CCA of Tenn., LLC, 694 F.3d 890, 894 (7th Cir. 2012) (citing Green v. Mansour,
474 U.S. 64, 73 (1985)). Because the plaintiff no longer is subject to the
allegedly unlawful treatment he received from the defendants at Dodge and

Racine, there is no ongoing violation of his rights that declaratory judgment could cure. The court will not allow him to proceed on that request.

To summarize, the court will allow the plaintiff to proceed against Dr. Richard Fuller at Dodge Correctional Institution on his claims under the Eighth Amendment and under state law for negligence and medical malpractice. He may proceed against Dr. Prapti Kuber and Dr. Justin Ribault and physical therapist Edward Neisner at Racine Correctional Institution on his claims under the Eighth Amendment and under state law for negligence and medical malpractice. The plaintiff may proceed against these defendants only in their individual capacities; he may not proceed against any defendant in his or her official capacity. He may proceed only on his request for damages and may not seek declaratory relief. The court will dismiss all other defendants and claims.

## III.    Conclusion

The court **GRANTS** the plaintiff's motion for leave to proceed without prepaying the filing fee. Dkt. No. 2.

The court **DISMISSES** defendants Keith Johnson, Jason Benzel, Joseph McLean, Nurse Brady, Nurse A. Eppin, Kristin A. Vasquez, Captain Weigand, Sergeant Lincoln, Sergeant Grau and Jason Wells.

Under an informal service agreement between the Wisconsin Department of Justice and the court, the court will electronically transmit a copy of the complaint and this order to the Wisconsin Department of Justice for service on defendant Richard Fuller at Dodge Correctional Institution and defendants Prapti Kuber, Justin Ribault and Edward Neisner at Racine Correctional

Institution. Under the informal service agreement, the court **ORDERS** those defendants to respond to the complaint within 60 days.

The court **ORDERS** that the agency that has custody of the plaintiff must collect from his institution trust account the **$325.53** balance of the filing fee by collecting monthly payments from the plaintiff's prison trust account in an amount equal to 20% of the preceding month's income credited to the plaintiff's trust account and forwarding payments to the clerk of court each time the amount in the account exceeds $10 in accordance with 28 U.S.C. §1915(b)(2). The agency must clearly identify the payments by the case name and number. If the plaintiff transfers to another county, state or federal institution, the transferring institution must forward a copy of this order, along with the plaintiff's remaining balance, to the receiving institution.

The court will send a copy of this order to the Superintendent at the Drug Abuse Correctional Center.

The court **ORDERS** that the parties must not begin discovery until after the court enters a scheduling order setting deadlines for completing discovery and completing dispositive motions.

The court **ORDERS** that plaintiffs who are incarcerated at Prisoner E-Filing Program institutions[4] must submit all correspondence and case filings to institution staff, who will scan and e-mail documents to the court. Plaintiffs

---

[4] The Prisoner E-Filing Program is mandatory for all persons incarcerated at Green Bay Correctional Institution, Waupun Correctional Institution, Dodge Correctional Institution, Wisconsin Secure Program Facility, Columbia Correctional Institution, and Oshkosh Correctional Institution.

Case 2:22-cv-01467-PP   Filed 06/09/23   Page 37 of 38   Document 10

who are incarcerated at all other prison facilities must submit the original document for each filing to the court to the following address:

> Office of the Clerk
> United States District Court
> Eastern District of Wisconsin
> 362 United States Courthouse
> 517 E. Wisconsin Avenue
> Milwaukee, Wisconsin 53202

DO NOT MAIL ANYTHING DIRECTLY TO THE JUDGE'S CHAMBERS. It will only delay the processing of the matter.

The court advises the plaintiff that if he fails to file documents or take other required actions by the deadlines the court sets, the court may dismiss the case based on his failure to diligently pursue it. The parties must notify the clerk of court of any change of address. The court advises the plaintiff that it is his responsibility to promptly notify the court if he is released from custody or transferred to a different institution. The plaintiff's failure to keep the court advised of his address may result in the court dismissing this case without further notice.

Dated in Milwaukee, Wisconsin this 9th day of June, 2023.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**