UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

CLARENCE ALBERT SAFFOLD, III,

                    Plaintiff,

        v.                                          Case No. 22-cv-1467-pp

DR. RICHARD FULLER, *et al.*,

                    Defendants.

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. NO. 77), DENYING PLAINTIFF'S MOTION TO COMPEL (DKT. NO. 96) AND DISMISSING CASE

Plaintiff Clarence Albert Saffold, III, who previously was incarcerated and who is representing himself, filed this case under 42 U.S.C. §1983 alleging that officials at Dodge Correctional Institution and Racine Correctional Institution violated his rights under federal and state law. The defendants have moved for summary judgment. Dkt. No. 77. Along with his response to the defendants' motion, the plaintiff filed a motion to compel. Dkt. No. 96. This decision grants the defendants' motion for summary judgment, denies the plaintiff's motion to compel and dismisses the case.

## I.      Procedural Background

The court screened the complaint and allowed the plaintiff to proceed on claims under the Eighth Amendment and under state law for negligence and medical malpractice against Dr. Richard Fuller at Dodge Correctional Institution and against Dr. Prapti Kuber, Dr. Justin Ribault and physical

1

therapist Edward Neisner at Racine Correctional Institution. Dkt. No. 10 at 36. Specifically, the court allowed the plaintiff to proceed on claims that:

- in November 2019, while the plaintiff was incarcerated at Dodge, Dr. Fuller declined to alter his medications even after the plaintiff told him that they were not helping in violation of the Eighth Amendment and declined to provide him a lower bunk restriction in violation of Wisconsin state law, dkt. no. 10 at 9–11, 24–25;

- from May 2020 through at least June 2021, Dr. Kuber failed to provide the plaintiff a lower bunk restriction, took his walking cane and did not give him alternative treatment for his pain in violation of the Eighth Amendment and Wisconsin state law, id. at 27–28;

- from July 2021 through early 2022, Dr. Ribault provided inadequate treatment for the plaintiff's medical issues and resulting pain, id. at 28; and

- in 2021 and 2022, physical therapist Neisner refused to treat the plaintiff despite doctors' referrals for physical therapy in violation of federal and state law, id. at 34.

On September 24, 2024, the court granted in part the defendants' motion for partial summary judgment on exhaustion grounds. Dkt. No. 38. The court granted the defendants' motion as it related to Dr. Ribault and dismissed Dr. Ribault and the claims against him without prejudice. Id. at 46. The court also granted the defendants' motion as it related to certain claims against Dr. Kuber, determined that the plaintiff could proceed against Dr. Kuber only on

his claim that she denied him a lower bunk restriction and dismissed all other federal claims against Dr. Kuber. Id. The court reserved ruling on the defendants' motion as it related to Dr. Fuller until after an evidentiary hearing. Id. The court held an evidentiary hearing on November 20, 2024, after which it denied the defendants' motion for partial summary judgment on exhaustion grounds as to the plaintiff's claims against Dr. Fuller.

## II.   Facts[1]

The defendants formerly were employed by the Wisconsin Department of Corrections Bureau of Health Services. Dkt. No. 79 at ¶¶1-3. Dr. Fuller worked as a physician at Dodge Correctional Institution during the events described in the complaint. Id. at ¶1. Dr. Kuber worked as a physician at Racine Correctional Institution and Edward Neisner worked there as a physical therapist. Id. at ¶¶2-3.

To obtain non-emergent health care, an incarcerated individual must submit a health service request (HSR) form to the health services unit (HSU) describing the health concern or treatment that is requested. Id. at ¶¶7-8. A nurse then triages the HSR. Id. at ¶9. Physicians and physical therapists do not triage HSRs. Id. at ¶10. When a patient directs an HSR to a specific medical staff member, the triaging nurse uses discretion in deciding whether to forward the HSR to that person. Id. at ¶11. Physicians and physical therapists respond to an HSR only if the triaging nurse forwards it to them. Id. at ¶12.

---

[1] The court includes only material, properly supported facts in this section. See Fed. R. Civ. P. 56(c).

A.     Treatment by Dr. Fuller

Dr. Fuller was the plaintiff's primary care physician at Dodge from September 3, 2019 to November 26, 2019. Dkt. No. 79 at ¶14. On September 9, 2019, Fuller saw the plaintiff for his intake history and physical examination. Id. at ¶15. The plaintiff reported that x-rays were taken on July 11, 2019 for his ankle but that he still could not run or jump. Id. at ¶16. He reported that his low back pain started after a fall six months prior. Id. The pain did not radiate into his buttocks or lower extremities. Id. The plaintiff told Fuller that walking, running and jumping were painful. Dkt. No. 94 at ¶16. On exam, Fuller made several findings: there were no deformities or ecchymosis around the plaintiff's ankle (meaning no discoloration of the skin resulting from bleeding underneath); some tenderness but normal range of motion of toes; full and normal back range of motion; and gait testing was normal except for favoring the left foot. Dkt. No. 79 at ¶17. The plaintiff states that his foot was tender, and that bending his toes and weight-bearing were painful. Dkt. No. 94 at ¶17.

Based on his examination, Fuller advised the plaintiff that his lower back pain sounded more like a musculoskeletal condition than a condition from significant nerve damage. Dkt. No. 79 at ¶19. Fuller ordered 7.5 mg meloxicam two times daily as needed for back and foot pain. Id. at¶¶20-21. Fuller informed the plaintiff that he could continue to wear the Ace bandage on his left foot. Id. at ¶21. Meloxicam is a nonsteroidal anti-inflammatory drug (NSAID) used to reduce pain and inflammation. Id. Fuller prescribed the

4

plaintiff meloxicam because the plaintiff did not feel he had good relief from the ibuprofen and Tylenol he had received while at Milwaukee County Jail. Id. at ¶22. Fuller advised the plaintiff that he was not a candidate for a low bunk restriction due to his age and relatively good health, and that he could slide down from an upper bunk and land on his right foot primarily without re-injuring his left foot. Id. at ¶23. The plaintiff states that he told Fuller that he could not safely use a top bunk, and he pleaded for a bottom bunk, but Fuller refused. Dkt. No. 94 at ¶¶23-24.

On September 24, 2019, the plaintiff submitted an HSR asking why he was being denied a low bunk when he had foot and back issues. Dkt. No. 79 at ¶25. Three days later, Fuller informed the plaintiff that his foot and back issues were not severe enough to warrant a low bunk restriction. Id. Fuller's response was based on his September 9, 2019 physical examination, which did not reveal findings that warranted a low bunk restriction. Id.

The plaintiff submitted HSRs to Fuller on October 17 and October 19, 2019. Dkt. No. 79 at ¶28. Fuller responded and said he would see the plaintiff at a follow-up appointment the next week. Id. The plaintiff's October 19, 2019 HSR says that he "jumped down off bed how [he] was instructed to and something 'popped' in [his] lower back[] and he has been "experiencing sharp pain ever[] since." Dkt. No. 80-1 at 155.

On October 25, 2019, Fuller saw the plaintiff for a follow-up regarding his back pain and left foot pain. Dkt. No. 79 at ¶29. The plaintiff did not report pain radiating down his legs, and he denied lower extremity numbness,

weakness or paresthesia. Id. On exam, Fuller noted that the plaintiff walked slowly and attempted to avoid placing weight on his left leg. Id. at ¶30. He also noted that the plaintiff had tenderness to palpation over his lumbar paraspinal (lower back) muscles, which were in obvious spasm. Id. The fact that the lumbar paraspinal muscles were in spasm means that this could have been the primary source of the plaintiff's low back pain, and not a herniated disc pressing on a nerve. Id. at ¶32. Fuller noted that the plaintiff had no evidence of loss of light touch sensation or motor strength in either leg. Id. at ¶33. These findings were consistent with the etiology of his low back pain being more musculoskeletal and not a radiculopathy from pressure on a nerve root in the lumbar spine. Id. at ¶34. The plaintiff states that he reported numbness, burning and pinching radiating into his groin/back. Dkt. No. 94 at ¶29.

The plaintiff reported that the meloxicam was not reducing the pain in his lower back and left foot, and he wondered why no scans of his back had been done. Dkt. No. 79 at ¶35. Fuller discontinued the plaintiff's meloxicam based on his report that it was not reducing his pain. Id. at ¶36. Fuller informed the plaintiff that he could take up to 1000 mg of Tylenol every six hours. Id. Fuller did not place the plaintiff on any other NSAIDS because the plaintiff was on a high dose of prednisone, a steroid, for his ophthalmopathy at the time of this visit. Id. at ¶37. Steroids have a stronger anti-inflammatory effect than NSAIDs and taking the two medications together can hasten the development of ulcers. Id. Fuller also referred the plaintiff to physical therapy, ordered a cane to help reduce the weight/pressure on the plaintiff's left foot

6

and leg, ordered baclofen to help relax the plaintiff's low back muscles (for the institutional maximum of twenty days for his pain) and ordered Tylenol 500 mg. Id. at ¶¶39-40. The order for baclofen was "PRN", or as needed. Id. at ¶41. Fuller declined to order imaging studies. Id. at ¶42. Imaging studies generally are not needed for low back pain unless there are specific indications of serious underlying problems, or if conservative treatment has not been effective. Id. Conservative treatment often resolves pain. Dkt. No. 79 at ¶45. It focuses on addressing the underlying causes of pain, such as muscle imbalances, poor posture or injury (as was the case for the plaintiff). Id. Many cases of low back pain resolve with conservative treatment, and it typically is the first line of treatment. Id. Conservative treatment is not limited to medications, because medications alone cannot always resolve pain. Id. at ¶46. Conservative treatment includes lifestyle changes, the use of assistive walking devices or nerve stimulation tools such as a TENS Unit. Id.

On November 5, 2019, the plaintiff submitted an HSR stating that his back pain seemed to be increasing with the use of baclofen and asking about imaging studies. Dkt. No. 79 at ¶49. The next day, Fuller informed the plaintiff that he had been assessed for his pain several times, and that there were no symptoms or exam findings that warranted further imaging studies. Id. Fuller informed the plaintiff that if he had new symptoms with his back pain, Fuller would see him for reassessment. Id. The plaintiff accepted and received baclofen two to three times daily for seventeen of the twenty days it was prescribed. Dkt. No. 79 at ¶50. The baclofen was prescribed for twice daily

7

dosing as needed, and the plaintiff was allowed to refuse doses. Id. at ¶51. The plaintiff states that Fuller instructed him to continue baclofen to allow it to build up in his system. Dkt. No. 94 at ¶51.

On November 9, 2019, the plaintiff submitted an HSR to Fuller stating, "If I'm experiencing spinal cord issues (as the meds I've been prescribed are prescribed for) that causes these back pains why wouldn't I be given imaging studies to pinpoint problem to bring remedy to before it becomes irreparable?" Dkt. No. 94 at ¶52; Dkt. No. 180-1 at 152. Two days later, Fuller informed the plaintiff that his baclofen was for painful muscle spasms and not because of any suspected spinal cord issue. Dkt. No. 79 at ¶52. Fuller advised the plaintiff not to request further imaging studies unless he had new symptoms concerning spinal cord issues. Id.

On November 15 and November 18, 2019, the plaintiff directed several HSRs to Fuller. Dkt. No. 79 at ¶53. Fuller saw the plaintiff on November 22, 2019 for a follow-up of his chronic low back pain and left foot pain. Id. at ¶54. The plaintiff reported having taken anywhere from 2000 mg to 4000 mg of Tylenol daily since his twenty-day course of baclofen had ended eight days prior to this appointment. Id. His back pain was worse in the morning, when he needed to lean more on the cane if he walked over 100 feet. Id. The plaintiff reported having spasms in the middle of his left foot five to six times daily, lasting five to ten minutes. Id. The plaintiff was trying to stretch his foot and was soaking it in warm water. Id. He reported less left foot pain when he was

applying an Ace wrap, but the ACE wrap was taken from him since it was not in WICS. Id.

On exam, Fuller found that the plaintiff was walking with a cane but did not appear in any "acute distress." Dkt. No. 79 at ¶55. Fuller noted that the plaintiff had mild tenderness to palpation in his left lumbar paraspinal region, and that he had no motor or sensory deficits in his lower extremities. Id. If the plaintiff had no motor or sensory deficits in his lower extremities, his low back pain etiology was highly unlikely to be neurogenic (disc compressing a nerve root). Id. at ¶56. This means that his symptoms and physical exam were not highly concerning for a radiculopathy, which would warrant urgent imaging of his lumbar spine. Id. The plaintiff states that during this appointment he exhibited visible pain, required a cane to ambulate, received continued ineffective medications and was given another ACE wrap instead of diagnostic escalation. Dkt. No. 94 at ¶¶54-57, 59.

Fuller advised the plaintiff that he could take up to 4000 mg of Tylenol daily as needed for his chronic lower back pain. Dkt. No. 79 at ¶57. Fuller also ordered a TENS (Transcutaneous Electrical Nerve Stimulation) unit for the lower back pain to see if it would be more effective than when the plaintiff had tried it during his time in jail. Id. A TENS unit is a device that produces mild electrical current to reduce pain. Id. at ¶58. For the plaintiff's left foot, Fuller gave him a two-inch ACE wrap to help reduce pain. Id. at ¶59. The plaintiff had been told several times he could not take muscle relaxants chronically unless

he had spasms secondary to spinal cord injury. Id. at ¶60. Fuller placed an order for a routine follow-up in four to six weeks. Id.

On November 26, 2019, the plaintiff transferred to Racine. Id. at ¶63. Fuller had no further involvement in the plaintiff's medical care. Id.

B.    Treatment by Dr. Kuber

When the plaintiff arrived at Racine, Dr. Kuber became his primary care provider, although other providers also cared for him. Dkt. No. 79 at ¶64. On January 14, 2020, Dr. McLean placed an order for the plaintiff to have 500 mg acetaminophen through January 8, 2021. Id. at ¶65.

On March 4, 2020, the plaintiff saw Nurse Tyler at "sick call" and asked Tyler about physical therapy and a low bunk restriction for his low back pain. Dkt. No. 79 at ¶66. Tyler noted that the plaintiff showed no signs of distress, and that his gait was steady. Id. at ¶67. Tyler noted that the plaintiff should continue using Tylenol as directed by his ACP (advanced care practitioner), that he had an appointment with physical therapy and his ACP that month and that he should talk to the ACP about a low bunk restriction. Id.

On March 12, 2020, Nurse Epping placed a note in the plaintiff's medical chart after the plaintiff had written an HSR asking for a low bunk restriction. Dkt. No. 79 at ¶70. She noted that, "Per WICS pt has a cane for assistance with walking, Unit Sgt reports that pt walks around the unit without a cane and also walks up and down stairs without difficulty." Id. Epping sent the plaintiff a letter advising him that "[a]fter reviewing your chart and speaking with the unit officers your low bunk will not be renewed at this time. PT and your provider

10

will be consulted regarding your low bunk restriction. Once a decision has been made you will be notified and the unit officer will be notified shall it be renewed. If you have any questions or concerns you may contact HSU using an HSR." Id.

> On March 17, 2020, Epping added a note to the plaintiff's medical chart:
>
>> Patient was seen in HSU on Friday 3/13/2020 regarding bunk restriction, Pt came to HSU without a cane and had a brisk steady gait, pt was not unstable while in HSU. Pt reported to writer he "sometimes" uses the cane. Pt also reports that he is able to go up and down stairs. Pt also admitted that he is able to get onto and off of top bunk. He just needs to use a chair to get down, 'It hurts when I jump down from the top bunk.' Pt was educated to not jump from top bunk but to slowly get down from top bunk and come down on uninjured foot/ankle. Pt was encouraged to be sure to be conscientious/careful when descending from top bunk. Pt educated on plan of care and agrees. Pt aware that PT will be consulted upon return as well regarding low bunk restriction.

Id. at ¶73.

> On May 4, 2020, Dr. Kuber saw the plaintiff for several issues. Dkt. No. 79 at ¶76. The plaintiff asked about using a cane, reporting that he had had an injury involving his back less than a year prior, and that since then, he had had some "aches and pains." Id. He had a TENS unit and a cane, but he did not find that either of them offered relief, and he could walk without a cane. Id. The plaintiff had an order for Tylenol 500 mg and said he used it when necessary for pain. Id. On exam, Kuber found that the plaintiff's gait was steady "without debility" when not using a cane. Id. at ¶77. Debility means any condition that may weaken the patient from performing regular duties of daily living or activities of daily living. Id. at ¶78. The plaintiff states that he informed Kuber that he could walk short distances but that he needed a cane for longer

11

distances. Dkt. No. 94 at ¶76. After her assessment, Kuber discontinued the use of a cane because it was not indicated. Dkt. No. 79 at ¶79. Kuber also recommended that the plaintiff be seen by physical therapy for an evaluation of whether he needed to continue using a TENS unit. Id. at ¶80.

On May 27, 2020, Nurse Johnson saw the plaintiff for chronic low back and left ankle pain. Dkt. No. 79 at ¶81. Johnson's assessment revealed that there were "no deficits noted" when the plaintiff ambulated to the exam area, and he did not appear to be in any distress. Id. at ¶82. At the time, the plaintiff was scheduled to be seen by a physical therapist to be evaluated on whether there was a need to continue using a TENS unit. Id. After the visit, Johnson sent Kuber a message about the plaintiff, stating that he was asking for further evaluation of his chronic pain, physical therapy treatment, a low bunk restriction and to be scheduled with Kuber. Id. at ¶83.

The next day, Kuber responded to Johnson's message, explaining that she had removed the cane because the plaintiff could walk without it, and that the plaintiff had agreed. Id. at ¶84. Kuber also informed Johnson that she had ordered physical therapy but that she did not feel that the plaintiff needed extensive work-up regarding his back pain. Id. As for the plaintiff's request for a low bunk restriction, Kuber did not provide one at the time because the plaintiff did not have any of the conditions that met the eligibility criteria in Health Services Policy and Procedure 300.07. Id. at ¶85. The plaintiff was independently walking without the use of an assisted walking device. Id. at

12

¶86. In addition, he did not have a neurological condition that otherwise would support a low bunk restriction. Id.

On June 3, 2020, Nurse Tyler saw the plaintiff for lower back pain and the plaintiff said that nothing was helping. Dkt. No. 79 at ¶87. Tyler examined the plaintiff, and all findings were normal. Id. at ¶88. Tyler gave the plaintiff an ice bag and Ibuprofen and told him to continue using Tylenol and the TENS unit. Id. Tyler also told the plaintiff that he had a physical therapy evaluation and an appointment with his ACP that month. Id.

On July 1, 2020, Dr. Kuber saw the plaintiff. Id. at ¶91. The plaintiff said that he continued to have back pain and that he was complying with his medical treatment. Id. He stated that he was performing his activities of daily living without debility, and that he was walking independently. Id. The plaintiff reported using the TENS unit but said it had little benefit. Id. Kuber offered the plaintiff a low dose of Elavil 25 mg (amitriptyline) to try for pain relief. Id. The plaintiff says that he did not say he performed all activities of daily living without difficulty, and he says that he reported he needed a cane. Dkt. No. 94 at ¶91.

On August 26, 2020, Kuber saw the plaintiff. Dkt. No. 79 at ¶92. The plaintiff reported that his low back pain ached and radiated to his left leg. Id. He pointed to his lower left abdomen area, stating that the pain started there and calling it "sciatica." Id. The plaintiff says that he discussed a bottom-bunk restriction with Kuber, and he disputes that the request was properly handled or implemented. Dkt. No. 94 at ¶92. Kuber did not believe that the plaintiff's

13

pain was sciatica because on exam, the plaintiff did not demonstrate a condition that suggested nerve root complication. Dkt. No. 79 at ¶93. Radiation of pain also can come from inflammation close to the nerves. Id. at ¶94. This does not necessarily indicate damage to the nerve. Id. First line treatment includes medications such as anti-inflammatories (diclofenac, ibuprofen, Motrin, naproxen are few examples) that help reduce inflammation, thereby alleviating pain in the localized area. Id. This, along with movement that includes stretching and physical therapy exercises, can help strengthen surrounding muscles, tissues and tendons to regain strength and mobility. Id. On exam, Kuber found and noted that the plaintiff's walk was steady and slow. Id. at ¶95. For treatment, Kuber believed that diclofenac could resolve the plaintiff's described lower back pain and radiating pain, because it is an anti-inflammatory medication that is commonly used and prescribed to minimize inflammation, so she ordered diclofenac topical as a "keep on person" to end on July 8, 2021. Id. at ¶96. The plaintiff states that he told Kuber that diclofenac and topical rubs previously had been ineffective. Dkt. No. 94 at ¶96.

On September 22, 2020, Nurse Herrington sent Kuber a message letting her know that the plaintiff had submitted an HSR asking in part about physical therapy. Id. at ¶98. Kuber responded to Herrington that day to let the plaintiff know that he had been discharged from physical therapy because he had failed to show up on time. Id. at ¶99. Kuber also said that she would not be able to re-order physical therapy until she discussed this with the plaintiff. Id. at ¶100. Kuber placed an order for amitriptyline that day. Id.

14

On December 28, 2020, Kuber ordered the plaintiff to have 500 mg acetaminophen as a "keep on person." Dkt. No. 79 at ¶102. On February 16, 2021, Nurse Tyler saw the plaintiff for low back pain during which the plaintiff said that he had bent down the day before and had hurt his back. Id. at ¶103. For treatment, the plaintiff was given ibuprofen 200 mg and muscle rub. Id. at ¶104.

On July 9, 2021, HSU sent the plaintiff a letter stating,

Per your HCP, there has been a change to your medications:

1. START-7/11/21 duloxetine 30 mg Take 1 capsule by mouth at bedtime.-SC

2. STOP-7/8/21 amitriptyline 50 mg Take 1 tablet by mouth 2 times a day at noon and at bedtime-SC

3. STOP-7/8/21 diclofenac topical 1% Apply 2 applications (Use dosing card to measure 4 grams) topically to the back, hips, knee and ankle 2 times a day in the morning and at bedtime as directed. Limit of 3 tubes per month.-KOP

KOP medications are keep on person. SC medications are staff controlled. Please report to the officer station at the assigned med pass time for SC medications. Medication(s) will be sent to your unit upon arrival from central pharmacy. Education has been provided if applicable. Your unit will be notified to send back discontinued medication(s) if applicable.

Id. at ¶105.

During the relevant timeframe, Kuber examined the plaintiff three times regarding his concerns of chronic low back pain: May 4, July 1 and August 26, 2020. Dkt. No. 79 at ¶106. The defendants state that the plaintiff did not request a low bunk restriction during those appointments with Kuber; if he had, Kuber would have documented the request in the plaintiff's chart. Dkt.

No. 79 at ¶107. The plaintiff disputes this and states that at each appointment he requested a bottom-bunk restriction and asked Kuber to coordinate with physical therapy. Dkt. No. 94 at ¶107. Kuber did not see the plaintiff's HSRs in which he asked for a low bunk restriction. Id. at ¶108. Those include HSRs dated July 22 and September 20, 2020 and June 17 and June 21, 2021. Id.

C.    Treatment by PT Neisner

On December 4, 2019, PT Neisner saw the plaintiff for the first time and determined that he would continue using a TENS unit for his low back pain. Dkt No. 79 at ¶109. Dr. Fuller had prescribed the TENS unit at Dodge, but the plaintiff did not receive it prior to his transfer to Racine. Id.

Neisner requires a referral from a provider to see a patient. Id. at ¶110. On May 28, 2020, Kuber gave Neisner an order to assess and treat the plaintiff. Kuber's order reads:

> Once - SC, improve mobility and independence. offer stretching/exercise regimen to improve strengthening. Pt had a cane which I removed as he was able to ambulate w/o any assistance. Pt request Tens - i'm not convinced he needs this. I defer to your expertise/supp.

Id. at ¶111.

On June 17, 2020, Neisner saw the plaintiff for a physical therapy evaluation for his lower back pain. Dkt. No. 79 at ¶112. The plaintiff complained of back pain primarily at the left sacroiliac (S-I) joint, which is a connection point between the pelvis and the lower spine. Id. at ¶113. The plaintiff reported a sudden onset of lower back pain about a year prior, after he had fallen. Id. at ¶114. He said the pain had not changed. Id. Neisner's

16

evaluation revealed lumbar active range of motion within functional limits. Id. at ¶115. He noted that there was normal core strength. Id. Neisner's evaluation also revealed decreased left hip flexor flexibility, and tenderness to palpation of the left S-I joint. Id. at ¶116. Neisner noted that the plaintiff's FABER test was positive, which indicated left S-I joint involvement. Id. at ¶118. Pain or limited movement during the FABER test can indicate issues with the hip, SI joint or surrounding muscles. Id. at ¶119. The plaintiff's Gillet's test also was indicative of left S-I joint involvement. Id. at ¶120. Finally, Neisner's evaluation revealed that MOI (mechanism of injury), signs and symptoms were consistent with left S-I joint hypomobility, which can lead to less mobility and more pain. Id. at ¶¶121-22. Neisner concluded that physical therapy might address these issues. Id. at ¶123.

Physical therapy is a beneficial treatment option for low back pain. Id. at ¶124. It can offer pain reduction, improve a person's mobility and flexibility, increase muscle strength, improve posture and increase the person's functional capacity. Id. Neisner's plan was for the plaintiff to be seen two times per week for three weeks for electrical stimulation, ultrasound, hot/cold pack, manual therapy, therapeutic exercises and a home exercise program (HEP). Id. at ¶126. Each time Neisner saw the plaintiff for physical therapy, he noted the plaintiff's subjective reports of pain, evaluated him, made objective findings and developed a physical therapy plan including HEP. Id. at ¶127.

The plaintiff was a "no-show" on February 26, April 1, June 26 and June 30, 2020 and February 17 and December 22, 2021. Dkt. No. 79 at ¶129. Per

17

policy, the plaintiff was discharged. Id. The plaintiff states that he missed some scheduled appointments because of court appearances, COVID lockdowns or facility actions preventing his attendance. Dkt. No. 94 at ¶129. He asserts that he did not intentionally fail to attend appointments. Id. The defendants say that under the policy, two consecutive unkept appointments without a reason lead to discharge. Dkt. No. 79 at ¶130. The policy ensures appointment compliance due to the large number of incarcerated individuals who need physical therapy but are waitlisted due to high demand. Id. It was Neisner's policy to write a note on the appointment slip if the patient was a previous "no show." Id. at ¶131. Many of the plaintiff's missed sessions occurred during the COVID-19 pandemic. Id. at ¶132. During that time, due to social distancing measures and a reduction in certain services, it was especially important that scheduled patients adhere to their appointments to avoid jeopardizing the care of other patients competing for the same time slot. Id.

On December 1, 2020, the plaintiff submitted an HSR stating that he needed to speak with Neisner about "his diagnosis, why he discontinued my therapy appoint., the location of medical records pertinent to his diagnosis and reasons for mandating treatment being that records were unavailable when I had file review (11/10/20)." Dkt. No. 79 at ¶133. The next day, Neisner informed the plaintiff that the plaintiff's initial physical therapy evaluation on June 17, 2020 was consistent with L S1 of hypomobility. Id. at ¶134. Neisner responded that the plaintiff had received physical therapy treatment on June 19 and June 23, 2020, but that he did not show up for physical therapy on

June 26 and June 30, 2020. Id. Neisner explained that two consecutive, no-show physical therapy appointments demonstrated non-compliance with physical therapy, and therefore the plaintiff was discharged. Id. Neisner informed the plaintiff that his notes were in his medical chart, and that he could request a record review. Id.

Neisner asserts that he did not fail to follow doctors' orders for the plaintiff in 2021. Id. at ¶135. A provider referred the plaintiff to Neisner and scheduled an evaluation for February 17, 2021, but the plaintiff did not show. Id. Neisner is not aware of a subsequent doctor's order for the plaintiff. Id. The plaintiff was not referred to Neisner by a provider in 2022. Id. at ¶136. So Neisner did not provide physical therapy to him in 2022, nor did Neisner fail to follow doctors' orders for him in 2022. Id. Neisner is not aware of any "mandated medical restrictions" that the plaintiff asserts he should have received. Id. at ¶137. If the plaintiff is referring to a low bunk restriction, Neisner asserts that a low bunk restriction is not a "mandated medical restriction." Id. There is no such thing as a "mandated medical restriction." Id. at ¶138. The plaintiff receives care in a correctional setting, so all requests for medical restrictions must receive prior approval. Id.

Neisner asserts that he did not fail to respond to the plaintiff's complaints of pain and requests for physical therapy. Id. at ¶139. Based on Neisner's review of Exhibit 1013, the triaging nurse answered the plaintiff's HSRs dated March 3 and July 22, 2020 and March 7 and May 11, 2021. Id. The triaging nurse forwarded only one of the plaintiff's HSRs to Neisner. Id. at

19

¶140. This HSR was dated December 3, 2020; in it, the plaintiff requested records, but he did not explain to Neisner why he missed his physical therapy evaluations on June 26 and June 30, 2020. Id.

The plaintiff asserts that Neisner received referrals, entered a low bunk restriction in WIC and developed a plan that was not implemented. Dkt. No. 94 at ¶¶135-141. The plaintiff states that he believes that communications, WIC entries, scheduling logs and other records relevant to implementation of low bunk restrictions and referrals are missing or incomplete. Id. at ¶143.

D.      Plaintiff's Bed Assignments

As a physical therapist, Neisner can only recommend a low bunk restriction to an ACP; he cannot approve a low bunk restriction. Dkt. No. 79 at ¶141. On June 17, 2020, Neisner placed a low bunk restriction with an end date of September 17, 2020, stating that the plaintiff was being treated in physical therapy for back and ankle pain. Id. at ¶142. Neisner placed this low bunk restriction after obtaining verbal approval from the plaintiff's provider but does not recall the name of the provider who approved his recommendation. Id. at ¶143. Three months is about the standard length of time for a low bunk restriction. Id. at ¶144. After three months, the restriction is re-evaluated. Id.

Neisner entered the plaintiff's low bunk restriction in WICS, but it did not go into effect right away on June 17, 2020. Id. at ¶145. During that time, the COVID-19 pandemic disrupted the normal operation and practices of the institution. Id. at ¶146. To limit the spread of COVID-19, the plaintiff may have been assigned to a cell in which he occupied an upper bunk until he could be

20

moved to a cell with an available low bunk. Id. Security staff ultimately determines whether restrictions can be implemented and has the final say. Id. at ¶147. For instance, security cannot implement low bunk restrictions if there are no available low bunks. Id. The plaintiff states that the bottom-bunk restriction should have been implemented immediately, and that staff failed to ensure that he received the lower bunk. Dkt. No. 94 at ¶¶145-47.

Bed assignments contain information such as the incarcerated individual's assigned institution, housing unit and bunk type (low or upper). Dkt. No. 79 at ¶148. At Racine, "1" refers to a low bunk assignment, and "2" refers to an upper bunk assignment. Id. The plaintiff was assigned a low bunk during most of his incarceration at Racine. Id. at ¶149.

### III.    Analysis

#### A.    Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Federal Rule of Civil Procedure 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Ames v. Home Depot U.S.A., Inc., 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." See Anderson, 477 U.S. at 248. A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

A party asserting that a fact cannot be, or is, genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

B.      Discussion

The defendants contend that they are entitled to summary judgment because they never consciously disregarded the plaintiff's medical needs. Dkt. No. 78 at 1. They also contend that they are entitled to qualified immunity. Id. at 16. Finally, the defendants contend that the court should relinquish jurisdiction over the plaintiff's state law claims. Id. at 18.

The plaintiff responds that the "record contains objective findings, repeated requests for imaging and physical therapy, PT referrals and a PT-entered low-bunk restriction that were not implemented, and missed appointments caused by court appearances and COVID-19 lockdowns rather than willful noncompliance." Dkt. No. 93 at 1. He contends that these facts create triable issues of deliberate indifference and preclude summary

22

judgment. Id. The plaintiff asserts that he had objectively serious medical needs, including "tenderness, limited lumbar range of motion, asymmetric reflexes, altered gait, need for an assistive device, and documented post-fall neurological complaints[.]" Id. at 4. He contends that the defendants had subjective knowledge of the risk based on his repeated reports of his symptoms to multiple providers, examinations and findings in the medical record. Id. The plaintiff maintains that reasonable jurors could find that the defendants acted with deliberate indifference and consciously disregarded the plaintiff's needs based on: (1) failure to order imaging despite red-flag findings and radiating neurological symptoms where objective findings and progressive neurologic complaints exist; (2) repeated reliance on ineffective medication and ACE wraps without diagnostic escalation or timely physical therapy (PT), providing only conservative topical/analgesic measures when those measures fail and not ensuring PT was scheduled and delivered; (3) formal approvals and WIC/PT entries that were not implemented; PT entries and low-bunk restrictions entered in the medical/housing system but not effectuated by housing/security creating triable issues whether medical orders were honored and whether the defendants disregarded known risks; and (4) application of rigid no-show policies during COVID-19 that resulted in the plaintiff being discharged from PT despite institution-caused absences, where institution actions (lockdowns, quarantines, court transfers) prevented attendance and the facility nevertheless enforced discharge and denied re-referral. Id. at 4-5.

The plaintiff also contends that discovery deficiencies and credibility conflicts preclude summary judgment. Id. at 6. He states that "internal communications, WIC/audit logs, PT attendance records, and housing assignment logs remain missing or incompletely produced," and that the court should deny summary judgment and permit targeted discovery. Id. Along with his summary judgment response, the plaintiff filed a motion to compel discovery, dkt. no. 96; the court will address that motion below.

The defendants reply that the plaintiff's assertion that missing documents preclude summary judgment lacks merit because the plaintiff does not explain what those documents are, how the allegedly missing documents are material to his claim or how their absence creates a genuine issue of material fact. Dkt. No. 97 at 2-4. The defendants contend that the plaintiff lacks the foundation to opine as to the care he should have received. Id. at 4. They also argue that the defendants cannot be deliberately indifferent because the remedial steps he says he required—PT, low bunk restrictions—were not within their power. Id. at 4-5.

The court analyzes a plaintiff's claim that the defendants were deliberately indifferent to his serious medical needs under the Eighth Amendment's cruel and unusual punishments clause. Estelle v. Gamble, 429 U.S. 97, 104 (1976). An Eighth Amendment claim consists of both objective and subjective components. Farmer v. Brennan, 511 U.S. 825, 834 (1994). To satisfy the objective component, the plaintiff must show that he "is incarcerated under conditions posing a substantial risk of serious harm." Id. In

24

the context of a claim that prison staff were deliberately indifferent to a plaintiff's serious medical need, the objective component requires the plaintiff to show that his medical need constitutes a risk of an objectively serious harm. Stewart v. Wexford Health Sources, Inc., 14 F.4th 757, 763 (7th Cir. 2021) (citing Balsewicz v. Pawlyk, 963 F.3d 650, 654 (7th Cir. 2020)).

To satisfy the subjective component, the plaintiff must demonstrate that the defendant had a "sufficiently culpable state of mind." Farmer, 511 U.S. at 834. A prison official shows deliberate indifference when he "realizes that a substantial risk of serious harm to a prisoner exists, but then disregards that risk." Perez v. Fenoglio, 792 F.3d 768, 776 (7th Cir. 2015) (citing Farmer, 511 U.S. at 837). "The standard of deliberate indifference 'requires more than negligence or even gross negligence; a plaintiff must show that the defendant was essentially criminally reckless, that is, ignored a known risk.'" Stewart, 14 F.4th at 763 (quoting Huber v. Anderson, 909 F.3d 201, 208 (7th Cir. 2018)). The plaintiff does not need to show that he was "literally ignored." Berry v. Peterman, 604 F.3d 435, 441 (7th Cir. 2010) (citing Sherrod v. Lingle, 223 F.3d 605, 611 (7th Cir. 2000)). "[A] doctor's choice of the 'easier and less efficacious treatment' for an objectively serious medical condition can still amount to deliberate indifference[.]" Id. (citing Estelle, 429 U.S. at 104). "A significant delay in effective medical treatment also may support a claim of deliberate indifference, especially where the result is prolonged and unnecessary pain." Id. (citing Grieveson v. Anderson, 538 F.3d 763, 779 (7th Cir. 2008) (reversing

summary judgment for defendants where plaintiff did not receive treatment for painful broken nose for nearly two days)).

1. *Dr. Fuller*

The defendants contend that the plaintiff's federal claim against Dr. Fuller—that he declined to alter the plaintiff's medications even after the plaintiff told him that they were not helping—lacks merit because Fuller was not aware of an objectively serious condition nor did he disregard the plaintiff's condition. Dkt. No. 78 at 6. The defendants state that Fuller examined the plaintiff only three times (September 9, 2019 for an intake exam; October 25 and November 22, 2019), and that based on these exams, Fuller did not believe that the plaintiff's condition was objectively serious. Id.; Dkt. No. 79 at ¶¶15-24, 29-44, 54-61. The defendants contend that even if the plaintiff's condition was objectively serious, Fuller did not disregard it. Dkt. No. 78 at 7. They state that the undisputed evidence shows that Fuller was attentive to the plaintiff's reports of pain and adjusted his medications when he examined the plaintiff. Id.; Dkt. No. 79 at ¶¶20-22, 28-32, 36-37, 40.

The plaintiff does not agree with the treatment Fuller gave him. He says that Fuller refused to provide x-rays, and that the plaintiff requested them multiple times. But the plaintiff is not proceeding on a claim based on Fuller's decision not to order x-rays. As the court stated in the screening order, Fuller's decision not to provide imaging studies does not state a claim. Dkt. No. 10 at 25. The plaintiff's disagreement with or dissatisfaction with Fuller's course of

treatment is not a basis for a constitutional violation. See Estelle, 429 U.S. at 107; Johnson v. Dominguez, 5 F.4th 818, 826 (7th Cir. 2021).

The record shows that each time Fuller examined the plaintiff, he changed the plaintiff's treatments for his back and foot pain, trying to address the plaintiff's medical issues, including his pain. At the intake appointment on September 19, 2019, Fuller assessed the plaintiff and ordered meloxicam for his lower back and foot pain and an ACE bandage for his foot. On October 25, 2019, the plaintiff reported he had fallen and that the meloxicam was not working for his pain. Fuller said that the plaintiff could take up to 1000 mg of Tylenol daily for pain. He also ordered baclofen for pain "as needed," referred the plaintiff for physical therapy and ordered a cane for the plaintiff to use. Fuller did not change the plaintiff's baclofen medication on November 5, 2019 after the plaintiff complained that his pain was worse with the medication. But the baclofen medication was "as needed," so the plaintiff did not have to take it. When Fuller saw the plaintiff on November 22, 2019, he ordered a TENs unit for the plaintiff and advised that the plaintiff could take up to 4000 mg of Tylenol daily. Fuller told the plaintiff that he could not take muscle relaxants chronically based on his diagnosis, and that Fuller did not believe that imaging was necessary based on the plaintiff's symptoms. Four days later, the plaintiff was transferred to Racine.

"[D]isagreement between a prisoner and his doctor . . . about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." Lockett v. Bonson, 937 F.3d 1016, 1024 (7th Cir. 2019)

(citing Pyles v. Fahim, 771 F.3d 403, 409 (7th Cir. 2014)). The court affords great deference to a medical practitioner's treatment decisions unless his response was so inadequate that it displayed an absence of professional judgment. Stewart, 14 F.4th at 763. Fuller did not disregard the plaintiff's medical needs, nor did he refuse to change the plaintiff's treatment when the plaintiff reported that he still was experiencing pain. The plaintiff has not shown that the treatment he received from Fuller was a substantial departure from accepted professional judgment. A reasonable factfinder could not conclude that Fuller acted with deliberate indifference in treating the plaintiff's medical needs. The court will grant the defendants' motion for summary judgment as to the plaintiff's federal claim against Fuller.

      2.    *Dr. Kuber*

The plaintiff's remaining claim against Dr. Kuber is that she declined to provide him with a low bunk restriction from May 2020 through June 2021, in violation of federal and state law. The defendants contend that the plaintiff's claim that Kuber failed to provide him with a low bunk restriction lacks merit because Kuber was not aware of an objectively serious condition and she did not consciously disregard the plaintiff's condition. Dkt. No. 78 at 9. The defendants state that Kuber examined the plaintiff only three times—on May 4, July 1 and August 6, 2020—and that she had no reason to believe that the plaintiff's foot and low back pain posed an excessive risk to his health or safety. Id. at 9-10. They also contend that even if the plaintiff's condition was objectively serious and Kuber was aware of that fact, she did not disregard his

condition. Id. at 11. They state that she referred the plaintiff to physical therapy and deferred to the professional judgment of physical therapist Neisner, who obtained the low bunk restriction the plaintiff wanted. Id.

It is undisputed that on May 28, 2020, Kuber referred the plaintiff to Neisner for physical therapy and deferred to Neisner's expertise regarding the plaintiff's treatment. The next month, on June 17, 2020, Neisner entered a low bunk restriction for the plaintiff, although the plaintiff did not move to a cell with a low bunk until July 9, 2020. Dkt. No. 79 at ¶¶112-126, 142. The record shows that the plaintiff was assigned to a cell with a low bunk from July 9 to July 22, 2020; from August 9 to December 11, 2020; and from December 21, 2020 to March 4, 2022. Id. at ¶¶142, 145, 149, 150.

The plaintiff contends that Kuber is liable because security staff did not follow the order for the low bunk restriction. But Kuber cannot be held liable for failure to act outside the scope of her authority. See Burks v. Raemisch, 555 F.3d 592, 595 (7th Cir. 2009) ("Bureaucracies divide tasks; no prisoner is entitled to insist that one employee do another's job."); Miller v. Harbaugh, 698 F.3d 956, 962 (7th Cir. 2012) ("[D]efendants cannot be [held liable under the Eighth Amendment] if the remedial step was not within their power"). Kuber did not disregard the plaintiff's foot and low back pain. Kuber's referral to physical therapy led the plaintiff to obtain a low bunk restriction. Kuber is not responsible for the time that the plaintiff did not have a low bunk restriction. A reasonable factfinder could not conclude that Kuber acted with deliberate

29

indifference. The court will grant the defendants' motion for summary judgment as to the plaintiff's Eighth Amendment claim against Kuber.

### 3. *Physical Therapist Neisner*

The plaintiff claims that in 2021 and 2022, Neisner refused to treat him despite doctors' referrals for physical therapy, in violation of federal and state law. The defendants contend that the plaintiff's claim that Neisner refused to treat him is without merit and that Neisner did not act with deliberate indifference to the plaintiff's medical needs. Dkt. No. 78 at 13. The plaintiff contends that the institution's no-show policy was too rigid and resulted in his being discharged from physical therapy. Dkt. No. 93 at 5. He says that it was not his fault that he missed appointments and that the institution prevented him from attending physical therapy because of COVID-19 related issues or court dates. Id.

It is undisputed that Neisner treated the plaintiff for physical therapy on December 4, 2019, June 17, June 19 and June 23, 2020. Dkt. No. 79 at ¶¶109, 112, 127. The plaintiff did not show up for his appointments on February 26, April 1, June 26 and June 30, 2020 and February 17, 2021. Id. at ¶129. Neisner discharged the plaintiff from physical therapy after his June 26 and June 30, 2020 no-shows based on institution policy. Id. at ¶¶130-131. In 2021, a provider referred the plaintiff to Neisner for an evaluation, but the plaintiff did not show up for the February 17, 2021 appointment. Id. at ¶129. Neisner is not aware of a subsequent doctor's order for the plaintiff. Id. at

¶135. A provider did not refer the plaintiff to Neisner in 2022; a referral is required to see Neisner for physical therapy. Id. at ¶136.

Neisner cannot be held liable for failing to treat the plaintiff when the plaintiff did not show up for appointments. See Pinkston v. Madry, 440 F.3d 879, 892 (7th Cir. 2006) (finding no deliberate indifference when incarcerated individual refused offered medical care). Here the plaintiff states that the institution prevented him from missing his physical therapy appointments. Assuming this is true, it is undisputed that he failed to explain why he missed the appointments, which means they were unexcused. Dkt. No. 79 at ¶140. Because the plaintiff's no-shows were unexcused, Neisner appropriately and reasonably discharged him from physical therapy. See Bell v. Wolfish, 441 U.S. 520, 547-48 (1979) ("Prison administrators [] should be accorded wide-ranging deference in the adoption and execution of policies and practices."). Further, the plaintiff has not alleged that *Neisner* created the institution's no-show policy, so even if the no-show policy was too restrictive, or someone in the institution prevented the plaintiff from attending his appointments, those claims are not appropriately directed at Neisner.

A reasonable factfinder could not conclude that Neisner acted with deliberate indifference to the plaintiff's medical needs. The court will grant the defendants' motion for summary judgment as to the plaintiff's Eighth Amendment claim against him.

Because the court has concluded that the plaintiff has no federal claims against the defendants, it will relinquish supplemental jurisdiction over the

31

plaintiff's state law claims. See 28 U.S.C. §1367(c)(3); <u>Lavite v. Dunstan</u>, 932

F.3d 1020, 1034-35 (7th Cir. 2019).

## IV.    Plaintiff's Motion to Compel (Dkt. No. 96)

Along with his response to the defendants' motion for summary

judgment, the plaintiff filed a motion to compel discovery in which he states

that the records the defendants produced in discovery are incomplete. Dkt. No.

96 at 2. He moves to compel the following documents:

1. Plaintiff requested medical records, PT referral and scheduling records, WIC/system entries regarding bottom-bunk restrictions, internal communications between medical staff and facility security regarding placement and accommodations, and HSRs.

2. Defendants produced some records but did not produce internal communications, WIC screenshots/audit logs showing entry and routing of bottom-bunk restrictions, PT scheduling logs/attendance records, or documents explaining why entered restrictions were not implemented.

* * * * * *

a. Internal communications (emails, messages, memos) between medical staff (including Ed Neisner, Drs. Fuller, Kuber, Ribault) and facility security/staff concerning Plaintiff's PT referrals, bottom-bunk restrictions, housing assignments, and implementation decisions;

b. WIC/system entries, screenshots, printouts, or audit logs showing date/time of entry, routing, status updates, and notes relating to Plaintiff's bottom-bunk restriction(s);

c. Physical therapy referral logs, scheduling records, attendance sheets, and PT progress notes for referrals related to Plaintiff;

d. Housing assignment logs or other documents explaining why a bottombunk restriction entered into WIC was not implemented.

32

Id. at 1-3. The plaintiff asks to be allowed to depose Neisner if the production of documents is not complete. Id. at 3.

The defendants contend that the court should deny the plaintiff's motion because he did not attempt to confer with them before filing the motion, they produced all requested records and did not withhold evidence and the plaintiff's request for new discovery is untimely. Dkt. No. 98. The plaintiff did not file a reply in support of his motion to compel.

Under Federal Rule of Civil Procedure 37, a party may file a motion to compel discovery where another party fails to respond to interrogatories or requests for production of documents. See Fed. R. Civ. P. 37(a)(3)(B)(iii) and (iv). The movant "must include a certification that the movant has in good faith conferred or attempted to confer with the person or party failing to make disclosure or discovery in an effort to obtain it without court action." Fed. R. Civ. P. 37(a)(1); see also Civil Local Rule 37 (E.D. Wis.). The plaintiff does not certify that he conferred with the defendants before filing his motion to compel. If the plaintiff thought the defendants' discovery responses were incomplete, he should have conferred with them long ago, before the deadline for completing discovery expired. The defendants state that they responded to the plaintiff's discovery requests on December 12, 2023 and March 3, 2025. Dkt. No. 98 at 3; see also Dkt. Nos. 99, 99-1, 99-2, 99-3. Moreover, to the extent the plaintiff seeks additional discovery not previously requested, he did not make that request prior to the expiration of the discovery deadline, which was March 21, 2025. Dkt. No. 48. The court will deny the plaintiff's motion to compel.

33

## V.   Conclusion

The court **GRANTS** the defendants' motion for summary judgment. Dkt. No. 77.

The court **DENIES** the plaintiff's motion to compel. Dkt. No. 96.

The court **ORDERS** that this case is **DISMISSED**. The clerk will enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30 days** of the entry of judgment. See Federal Rules of Appellate Procedure 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. See Fed. Rule of App. P. 4(a)(5)(A).). If the plaintiff appeals, he will be liable for the $605 appellate filing fee regardless of the outcome of the appeal. If the plaintiff seeks to proceed on appeal without prepaying the appellate filing fee, he must file a motion *in this court*. See Fed. R. App. P. 24(a)(1). The plaintiff may be assessed a "strike" by the Court of Appeals if it concludes that his appeal has no merit. If the plaintiff accumulates three strikes, he will not be able to file a case in federal court (except a petition for *habeas corpus* relief) without prepaying the full filing fee unless he demonstrates that he is in imminent danger of serious physical injury. Id.

Under certain circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief

34

from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Rule 59(e) must be filed within **28 days** of the entry of judgment. The court cannot extend this deadline. <u>See</u> Fed. R. Civ. P. 6(b)(2). Any motion under Rule 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. <u>See</u> Fed. R. Civ. P. 6(b)(2).

The court expects parties to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated in Milwaukee, Wisconsin this 13th day of February, 2026.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**